HENRY SCHMIDT

*v.*

AUGUST BROWN *et al.*

*Opinion filed April 18, 1907.*

1. HIGHWAYS—*way by prescription must be based upon adverse use.* To establish a way by prescription, either. public or private, the use must have been adverse, uninterrupted, exclusive, continuous and under a claim of right.

2. SAME—*a claim of right may arise from a void contract.* An agreement for a way over land which is void under the Statute of Frauds because not in writing, may nevertheless be the foundation of a claim of right upon which an adverse use may be based.

3. SAME—*whether agreement operates as a license or as a claim of right depends upon the language employed.* Whether an agreement for a way over land operates as a license or as a basis for a claim of right depends primarily upon the language used, and if the language purports to give a right to the way, and the use is continued under such claim of right for a period of twenty years, the use is adverse and will ripen into a prescription.

4. SAME—*permissive use may be changed to use under claim of right.* A permissive use of a way which has continued for many years without interruption may be changed by a parol agreement into a use under claim of right, where the owner of the land over which the way passes agrees with the other party that if the latter will aid in securing a permanent outlet for the way over other lands to the highway he shall forever have the right to the way.

5. SAME—*meaning of term "exclusive use."* "Exclusive use," such as is essential to a way by prescription, does not mean that the way shall not be used by any one except the party claiming the easement, but only that his right to use the way shall not depend upon a like right in other persons.

6. SAME—*when way is appendant.* A way which leads to lands of the owner of the easement, is used solely for access to his land and is useless except in connection with it, is appendant to the land and is an inheritable estate, which passes to the heirs and to all subsequent grantees.

7. SAME—*purchaser of the servient estate takes title subject to visible easement.* A purchaser of an estate which is charged with an easement which is discoverable upon examination, such as an open and visible roadway, takes his title subject to such easement, to the extent his grantor is bound thereby.

8. TRESPASS—*party owning easement of way may peaceably remove gates*. One having a prescriptive right to a passageway over lands of another has a right to peaceably remove gates put up by the purchaser of the servient estate, where the latter, after notice to remove them, refused to do so and kept them locked.

APPEAL from the Circuit Court of Massac county; the Hon. W. W. DUNCAN, Judge, presiding.

This is an action of trespass *quare clausum fregit*. The defendants set up the claim that the *locus in quo* was a private way of defendants, and that they entered peaceably and without unnecessary force to remove obstructions wrongfully placed therein by the plaintiff; also that the way was a public highway, and that the supposed trespasses were justifiable in removing obstructions from said highway so wrongfully placed there by the plaintiff. The cause was tried by the court without a jury. The court found the defendants not guilty and rendered judgment against the plaintiff for costs, from which plaintiff appeals and brings the record to this court for review.

The errors relied on arise on certain propositions of law submitted by appellees and held as law and the refusal of the court to hold certain propositions submitted by appellant, which are referred to in the opinion which follows.

There is but little dispute as to the material facts. So far as they are necessary to a decision of the questions involved the evidence establishes the following facts: Appellant and appellees reside on adjoining farms. They are each in possession and control of eighty acres of land. Appellant's eighty acres is south of appellees',—that is, the north forty of appellant adjoins the south forty of appellees. The two tracts comprise a body of land one mile in length north and south and one-quarter of a mile east and west. The north eighty is in the possession and control of appellees and their mother, and will hereinafter be referred to as the "Brown farm," and the south eighty is owned and occupied by the appellant, and will hereafter be referred to as the "Smith

farm." The Smith farm was purchased in 1851 by Peter Smith. He built a house a short distance south of the north line of his south forty and some distance west of the east line of said forty-acre tract. He built a barn on the same forty-acre tract a short distance east of his house. At the time Peter Smith built his house and barn there was a road running north and south through his south forty, which passed between his dwelling and his barn and extended north through his north forty to the east and west line between the Brown and Smith farms. This road was fenced on both sides through the south forty of the Smith farm and the fences extended a short distance north into the north forty of the Smith farm. As the land was cleared up in the north forty Smith extended his fence further north, but at no time have the fences been extended to the Brown farm. There is now, and always has been, a part of the north half of this road upon open woodland. Peter Smith occupied this farm, either in person or by tenants, until his death, which occurred in September, 1893. After his death his son, Thomas Smith, succeeded to the title and possession of the Smith farm and held the same until August, 1905, when he sold it to appellant, Henry Schmidt. Appellant had resided on the Smith farm as a tenant of Thomas Smith about five years before he bought the farm.

The Brown farm-house was on the south forty of the Brown eighty acres and near the division line between the Smith and Brown farms, and only a short distance from the north end of the road in question. The Brown farm was bought by Dr. Joseph Brown, father of appellees, in 1863. His widow, Charlotte Brown, testified that her father and mother resided on the Brown farm from 1843 until her husband acquired it, in 1863, and that when she first knew the place, in 1843, the road in question was located in substantially the same place where it now runs, except some slight changes have been made to straighten a curve in it, for the convenience of Thomas Smith, after the death of Peter

Smith. There is not now, and never has been, any other road leading to or from the Brown farm, and all travel to and from the Brown farm was over the Smith farm along the road in question. The evidence shows that Dr. Brown was a practicing physician and did an extensive practice, and that the road was used by him in his practice and by persons coming for him, and by him and his family in going to church, to Metropolis, to the cemetery,—in short, it was the only way the Brown family had to travel going away from or returning to their home. While the public used this road whenever any one had occasion to go to the Brown place, it was never worked as a public highway and was always regarded as a private country road. It was kept in repair by the Browns. In 1886 Dr. Brown died, leaving his widow, and appellees, his sons, in possession of the Brown farm. In 1888 Peter Smith asked and obtained permission of the widow and Gus Brown, the eldest son, to place gates across this lane,—one at the south end and one at the north line of the south forty. These gates were put up by Peter Smith so as to allow his live stock to pass and re-pass to water, which was furnished by a pond near the south side of the Smith farm. The gates were never locked, and it was understood between the Browns and the Smiths that he had no purpose of interfering with the continued enjoyment and use of the road in putting up the gates. The gates were only maintained for a short time and then they were opened and through neglect soon became out of repair. There was no interruption of the use of the road by reason of these gates. After Thomas Smith purchased the Smith farm, gates were again put up by him with the knowledge and consent of the Browns. They were never locked, and were not placed there to obstruct or interfere with the use of the road but solely for his own convenience. They were only closed about one month in the year, and during such time the road was used as before, only the gates were opened and closed by persons passing over the road.

In the spring of 1883 a man by the name of Kennedy, who owned land south of the Smith farm and over which Smith and Brown had enjoyed a road or passway out south, threatened to close up the way. Peter Smith and Kennedy were not on friendly terms but Brown and Kennedy appear to have been good friends. Smith was anxious about the Kennedy road and did not want Kennedy to close him out. The evidence shows that Peter Smith called on Dr. Brown to negotiate with Kennedy to buy a roadway over the Kennedy land. Brown said, "What about my road over your land?" Smith told him if he would go to Kennedy and help buy a road over his land that Brown should always have a way over the Smith land. Smith assured Brown that he should never be closed up over his land. Dr. Brown went to Kennedy and secured the road, and appellees hauled rails and built fence for Kennedy in pursuance of the contract their father had made with Kennedy. The evidence shows that Dr. Brown complied literally with Peter Smith's proposition with regard to the Kennedy road. The evidence further shows that Peter Smith and his son, Thomas, respected the promise to Dr. Brown, and never sought to interfere in any way with the full use of the road in question so long as they had control of the farm.

After appellant obtained the title to the Smith farm, in 1905, he asked permission of Gus Brown to close the gates while he removed and changed his pasture fence. This permission was granted. The gates were put up and closed but not locked. After the change in the fence had been made appellant refused to open the gates. They were locked by appellant and notices posted up forbidding anyone from going through and threatening a prosecution for trespass. Gus Brown went to appellant and requested him to open the gates. Appellant refused, and Gus Brown told him that if he did not open the gates he (Gus Brown) would open them. After waiting a day or two, the gates still being closed and locked, appellees lifted the gates off their hinges and turned

them around out of the road and pulled up a post which had
been set in the roadway. Appellant put the gates up again
and appellees again took them down. This was repeated
three times, and this suit was brought for the alleged tres-
pass in taking down the gates. There is no claim that the
appellees went upon any part of the premises other than the
roadway or that there was any unnecessary damage done in
removing the gates.

COURTNEY & HELM, for appellant.

C. L. V. MULKEY, for appellees.

Mr. JUSTICE VICKERS delivered the opinion of the court:

By appellant's second and appellees' fourth propositions
of law submitted, the trial court·was asked to declare the
legal effect of the contract between Peter Smith and Dr.
Brown of 1883, set out in the foregoing statement. Appel-
lant asked the court to hold that the effect of such agreement
was merely to give Brown a parol license, which was revo-
cable. The court refused to so hold, but held, as requested ·
by appellees' fourth proposition, that the way in question
had been used as a private way for more than twenty years
under an. agreement with the owner of the land, Peter
Smith, made in 1883, by the father of appellees, and that it
had been used under a claim of right with the knowledge
and acquiescence of Peter Smith and Thomas Smith, his
successor in title. These rulings are assigned as error and
relied on by appellant to reverse the judgment below.

The alleged agreement not being in writing, was void
under the Statute of Frauds and could not operate as a grant
or a conveyance; but the parties to it treated it as giving
Dr. Brown some sort of right to the roadway, and under
this supposed agreement he claimed the right to use the road
in question, and his claim thereto was known to Peter Smith
and his son, both of whom recognized the claim of right in

the Browns to the use of the roadway. Appellant contends that since the alleged agreement between Peter Smith and Dr. Brown was inoperative and void under the Statute of Frauds, the only effect it could have was merely as a permission from Smith to Brown to use the way, which, having originated in a license, could never ripen into a prescriptive right, however long continued.

There can be no question as to the legal conclusion of appellant if he is right in his contention as to the meaning of the alleged contract. In order to establish a way by prescription, either public or private, the use must be adverse, uninterrupted, exclusive, continuous and under a claim of right. (*Town of Brushy Mound* v. *McClintock,* 150 Ill. 129; *City of Chicago* v. *Chicago, Rock Island and Pacific Railway Co.* 152 id. 561; *Township of Madison* v. *Gallagher,* 159 id. 105; *Illinois Central Railroad Co.* v. *City of Bloomington,* 167 id. 9; *O'Connell* v. *Chicago Terminal Railroad Co.* 184 id. 308.) When the arrangement was entered into between Peter Smith and Dr. Brown in regard to this road, it is clear, both from the language used and the subsequent conduct of both parties, that it was the understanding that Dr. Brown was to have something more than he had hitherto enjoyed in the roadway. The evidence shows that the roadway had been open to the free and uninterrupted use of Dr. Brown and his predecessor in title for about forty years prior to 1883. At no time had there been the slightest objection or interference by Smith of such use, but up to 1883 it might be doubted whether the use was under a claim of right. Dr. Brown's desire for further assurances from Smith as to the future use of the road might have proceeded from a want of entire confidence in his right as it then existed, or, on the other hand, it may have arisen from a wise foresight which enabled him to turn to good account the exigencies of the situation and re-enforce his claim against possible future attacks without implying any want of confidence in his right as it then existed. However

this may have been, it is certain that it was not the intention of the parties that Brown's position was to be made less secure by the agreement than it was before. If appellant's contention is sustained, the result is that the agreement converts a user of about forty years, which might be the basis of a prescriptive right, into one under a license, thereby destroying any existing right acquired by past user and at the same time making it impossible to acquire any prescriptive right in the future. Manifestly, such was not the intention of the parties. Whether the agreement is to operate as a license or as the basis for a claim of right depends primarily upon the language employed by the parties. If the language is such as to create a license only, the enjoyment under it is to be regarded as permissive and not of right, and no title is acquired under it, however long continued. If, on the other hand, the language purports to give a right to the way and the use is continued under such claim of right for twenty years, the use is adverse and will ripen into a prescription. (Jones on Easements, sec. 179.)

There is a substantial agreement between the witnesses as to the language of this agreement. Thomas Smith says: "I heard my father say this: 'If you will make a road through Kennedy's place then you shall always have a road out to it.'" On cross-examination this witness says: "My father said if they would help him with a road that he would see that he was not shut up,—something to that amount. Anyway, it was an agreement between Dr. Brown and my father that the road should be left open. They made the road themselves to get into the new Vienna road. As long as my father lived that agreement was carried out. My father and Dr. Brown got the road through the Kennedy place." Appellee Gus Brown testifies: "Mr. Smith and my father bought this road in order to get to town, and then my father said to him: 'Mr. Smith, I am willing to help you buy that road, but I am just a half mile from this road, and it may be you or somebody else would want to shut me up,

and I am willing to help buy that road if you will give me assurance that that will be open.' Smith says: 'You shall always have a road; I will see that you are never shut out.' A day or two later my father went down and bought the road." John Smith, son of Peter Smith, says: "My father told Brown that he would see that he was never shut out. 'You shall never be shut up,' I think are his very words." James Brown gives a similar account of the agreement.

The evidence is clear and satisfactory that Dr. Brown carried out his part of the agreement and that the road over the Kennedy land was opened up and used in accordance with the wishes of Peter Smith. It is also shown, without any contradiction, that Peter Smith and his son, Thomas, always recognized the right of Dr. Brown and his family to use the road at all times. Two years after the death of Dr. Brown, which occurred in 1886, Peter Smith applied to the widow and Gus Brown for permission to put up gates in the road. Instead of the use of Brown being by the mere permission of Smith, the evidence shows that Smith would not place gates in the road without the permission of the Browns. Again, after the death of Peter Smith, when Thomas Smith wanted to straighten the road so as to put his land in more convenient shape for cultivation, he applied to the Browns for permission, and the road was straightened accordingly. Beginning in 1883, under a claim of right the Browns used the roadway continuously until the appellant locked the gates, in 1905,—a period of over twenty-two years. Thus, taking the language of the parties into consideration as well as their conduct under the agreement, it is clear that the parties to the contract understood that in consideration of Brown's assistance in procuring the Kennedy road he was acquiring a permanent right to the road through the Smith farm.

We do not want to be understood as holding that this parol agreement was valid and had the effect of transferring any right or title to Dr. Brown. On the contrary, we hold

that the contract was utterly void under the Statute of Frauds. If the contract was valid and passed the title to the easement we would have no occasion to consider the question of prescription. Even though the contract was void because not executed in conformity to the Statute of Frauds, yet such contract may serve to show that Brown's user was under a *claim of right*. The *claim of right* which enters into every case of adverse enjoyment need not be a well founded claim,—it need only be a *claim* of right. A user under a contract void under the Statute of Frauds is a good claim of right. (Washburn on Easements, chap. 1, sec. 4, par. 28; Jones on Easements, sec. 179; Buswell on Lim. and Adverse Possession, sec. 267; *Graham* v. *Craig*, 81 Pa. St. 459; *Outcalt* v. *Ludlow*, 32 N. J. L. 239; *McKenzie* v. *Elliott*, 134 Ill. 156.) "A grant, a sale, or gift of lands by parol," says Shaw, C. J., in *Summer* v. *Stevens*, 6 Metc. 237, "is void by the statute; but when accompanied by actual entry and possession it manifests the intention of the donee to enter and take as owner, and not as tenant, and it equally proves an admission on the part of the donor that the possession is so taken. Such possession is adverse." Brown's use of this road was adverse, uninterrupted, continuous and exclusive and under a claim of right. The fact that other persons also used the roadway does not prevent Brown's user from being exclusive. "Exclusive use" does not mean that no one used the way except the claimant of the easement. It means no more than that his right to do so does not depend on a like right in others. The use may be exclusive, within the meaning of this rule, even though Smith and others also used the road. Washburn on Easements, sec. 44, p. 164; Jones on Easements, sec. 272; *Bennett* v. *Biddle*, 150 Pa. St. 420; *McKenzie* v. *Elliott, supra.*

We are of the opinion that the agreement, and the user under it for more than the requisite period, together with the clear recognition of Brown's rights by the owners of the Smith farm, warranted the court below in refusing appel-

lant's second proposition of law, in which the court was requested to hold that such agreement only operated as a license, and that appellees' fourth proposition was a correct legal conclusion under the evidence in the record.

Appellant has cited a number of decisions of this and other courts which hold that where the proprietor of land has a private way through his own land and for his own use, the mere permissive use of it by others for any indefinite time, such as a half a century, would not confer any right to its continued enjoyment. Among the cases in this court where this rule is recognized are *Dexter* v. *Tree,* 117 Ill. 532, *City of Chicago* v. *Chicago, Rock Island and Pacific Railway Co.* 152 id. 561, and *City of Chicago* v. *Borden,* 190 id. 430. These cases, and others in line with them, are not applicable to the facts here. Where a proprietor sets apart a portion of his land for a private passway for his own personal use across his own land to reach a street, a public highway or other point, the bare fact that the public or other persons may also use such private passway gives no right by prescription. But that is not this case. Here Peter Smith did not lay out this road as a private way for his own use, nor does it appear that his predecessors in title, if there were any, laid out the road. The road was in existence at least ten years before Smith obtained title, in 1853. The road extended, not from Smith's farm to a highway, but from Brown's place, more than a quarter of a mile north of the Smith house. How, then, can it be said that the road in question was the private way of the proprietor of the Smith farm? True, the road is located upon the Smith farm, and should the way be abandoned the roadway would revert to the owner of the Smith farm; but this same contention could be made with respect to most highways or private ways in the State. The very existence of an easement presupposes that the title to the reversion is in another. No one can have an easement in his own land. If one having an easement acquires the fee in the servient estate the ease-

ment is destroyed.   (3 Greenleaf's Cruise on Real Property, 225; Jones on Easements, sec. 835.)   Smith had no easement in this roadway.   His title to the road was a fee in the land and was not any different from his title to the residue of the farm.   That Smith owned the fee is conceded, but that he had any higher or different right to the roadway than to any other part of his farm is denied.   He could pass over the roadway; so could he likewise pass over any other portion of his farm.   But his title in the roadway was charged with the burden of the easement which appertained to the Brown farm as the dominant estate, which he could not lawfully interrupt or destroy.   Cases may be found where a proprietor has set apart a strip of his estate for his convenience in passing and re-passing and which is used by the owner as a passway, wherein such strip may be spoken of as a private way of the owner; but such language should not be understood as describing any different right or title than exists to the whole estate, but only as describing the use to which the owner has elected to put a part of the estate.

Appellant insists that the use of this roadway under the agreement brings this case within the rule laid down in *Forbes* v. *Balenseifer,* 74 Ill. 183, and *Lambe* v. *Manning,* 171 id. 612.   To this we cannot assent.   In the *Forbes case* four adjoining land owners agreed, by parol, to leave one rod outside of their fences for a road north and south, thus making a road two rods wide running across their lands to a highway on the south.   The fences were so built and the road opened for the use of the said proprietors.   In a short time, less than three years, one of the proprietors sold his land without making any reservation.   After the purchaser of one tract became the owner he closed the lane by erecting gates.   There was no question of prescriptive right involved, and the court held that the parol agreement merely operated as a license and that no interest in the easement passed.   Had the proprietors of the other tracts used this way for twenty years under the agreement as a claim of right and had such

right been recognized by the purchaser, then there would be some analogy between that case and the case at bar. In the *Lambe case* there was a mere license to take gravel from a pit to repair a mill-dam. It was held that the death of the licensor or licensee revoked the license, and that a remote grantee of the mill property could not set up a right to use the gravel pit after the licensor's death and after the property had been sold under partition. The easement in the *Lambe case,* if such it could be called, was in gross, and in no event could the owners of the mill property set up a claim thereto simply because a remote owner of the mill had once enjoyed such an easement. We fail to find anything in either of these cases that militates against the views we have expressed in the case at bar.

Appellant urges upon our attention the suggestion that if any easement existed here it was personal to Dr. Brown, and that appellees, who are his children, cannot set up such easement as a justification of the alleged trespasses,—in other words, it is said the easement, if any existed, was in gross and not appendant to the Brown farm. In the absence of proof to the contrary it will be presumed that Dr. Brown died intestate, and that appellees, as his heirs, inherited, together with his other children, all of his inheritable property. (*Lyon* v. *Kain,* 36 Ill. 362.) Being the owners, by descent from their father, as tenants in common, of the Brown farm, appellees might lawfully do what any other tenant in fee could do to enable them to enjoy the estate and its appurtenances. Was the way in question a way in gross or was it appendant to the Brown farm? A way that is appendant is an inheritable estate and passes to the heirs and to all subsequent grantees. If the way leads to the grantee's land and is useless except in connection with it, and was used solely for access to such land, it is appurtenant to it. (Jones on Easements, sec. 19.) A way is in gross when there is not a dominant estate to which it is attached. (*Garrison* v. *Rudd,* 19 Ill. 558; *Koelle* v. *Knecht,* 99 id.

396; *Willoughby* v. *Lawrence,* 116 id. 11.)   In the *Rudd case* it was said (p. 564) : "They [private ways] are said to be appendant or appurtenant when they are incident to an estate, one terminus being on the land of the party claiming, must inhere in the land, concern the premises and be essentially necessary to their enjoyment."   Again, in the same case, it is further said : "This right is said to be in gross when it is not attached as an incident to an estate, and is conferred by deed or by reservation in a deed, the distinction being quite manifest between a grant of land where a way is appendant which carries the way, and a grant of a way separate from any estate, in gross or specially."   In *Koelle* v. *Knecht, supra,* it was said (p. 403) : "It [an easement] is appurtenant or appendant to an estate in fee in lands, or in gross, to the person of the grantor for life or for years. * * * When in gross it is purely personal to the holder. When appurtenant, it is attached to and is an incident to the land and passes with it, whether the land be conveyed for a term of years, for life or in fee.   It is an incident to the land, and cannot be separated from or transferred independent of the land to which it inheres.—Washburn on Easements, p. 10."   The way in question has all of the elements of an easement appendant to the Brown farm as the dominant estate, and hence it passed to appellees as an appurtenance to their father's estate.

Finally, it is contended that appellees had no right to take the law into their own hands and remove the gates from the way, and that even if the right of way existed, it is said appellees did not have the legal right to remove the gates. This is a misapprehension of the rule of law applicable to the facts.   We have already sought to show that appellees were entitled to the enjoyment of an easement over the lands of appellant.   A purchaser of a servient estate charged with an easement which is discoverable on examination, takes his title subject to the easement. (*Morrison* v. *King,* 62 Ill. 30; *Ingals* v. *Plamondon,* 75 id. 118; *Cihak* v. *Klekr,* 117 id.

643; *Edwards* v. *Haeger,* 180 id. 99.) Appellant had no better right to obstruct this road than his grantor. The roadway was open and visible and appellant had occupied the Smith farm for five years before he purchased it, during which time it is fair to assume that he became familiar with the road and the uses which the Brown family made of it. As already pointed out, he asked and obtained permission to put the gates up in the first instance, which indicates that he had full notice of the rights of the Browns in the roadway. After appellant had locked the gates and refused to open them upon notice, appellees clearly had the right to peaceably remove the gates. The right to remove a private nuisance by abatement by the party aggrieved has always been recognized by the common law. In Cooley on Torts (3d ed. vol. 2, p. 748,) the author says: "As an obstruction or encroachment would constitute a private nuisance, the owner of the easement may, when practicable, under the rules applicable to the abatement of nuisances in general, proceed to abate it." If in so doing the owner exceeds his right he becomes a trespasser. (See, also, Webb's Pollock on Torts, p. 515.) The rule applicable to the abatement of nuisances by a private individual is thus stated in a note found on page 515 of Pollock on Torts: "The true theory of abatement of nuisance is, that an individual citizen may abate a private nuisance injurious to him when he could bring an action, and also when a common nuisance obstructs his individual right he may remove it to enable him to enjoy that right, and he cannot be called in question for so doing."

We conclude that the conduct of appellees was within the protection of the law, and that the court properly held that they were not guilty of the trespass alleged against them. It follows that the judgment of the trial court is free from error and that the same should be affirmed.

*Judgment affirmed.*