(No. 21044.—

EVERT T. LOOK, JR., Appellee, *vs.* ANTJE BRUNINGA *et al.* Appellants.

*Opinion filed April 23, 1932.*

HENRY MANSFIELD, and DAVID J. COWAN, for appellants.

GEORGE JOCHEM, for appellee.

Mr. COMMISSIONER EDMUNDS reported this opinion:

Evert T. Look, Jr., filed a bill in the circuit court of Peoria county to restrain Antje Bruninga and Lammert G. Bruninga from interfering with the complainant in the use of a roadway. The cause was referred to a master, who heard evidence and recommended that the relief prayed be granted. From a decree entered in accordance with this recommendation the Bruningas have appealed.

On August 20, 1850, Evert Tebbon Loock, grandfather of appellee, purchased an eighty-acre tract of land in Peoria county. The north half of this tract will be spoken of hereinafter as the north forty and the south half as the south forty. Loock lived in a house on the south forty. The house stood some distance from the highway which runs east and west along the south line of the south forty. A road led from the highway to a point near the house and then extended through the barnyard across a creek and natural ravine and over a hill in a general northwesterly direction. There was a gate across the road near the barnyard. Loock died intestate in 1876. Tebbe E. Look, Lammert Look, Bonnie Look, John E. Look and George Look, Loock's sons, were his only heirs-at-law. Bonnie Look was the father of appellee. In 1883 or 1884 these heirs came together to settle the estate. As a result of the proceedings Bonnie was deeded the north forty and George the south forty. The consideration stated in each deed was $1842.50. Upon the death of Bonnie ownership of the north forty passed to appellee. Appellant Antje Bruninga acquired the south forty by purchase in 1926.

While the record is voluminous it is necessary to note the evidence in its controlling phases only. Appellee testified that he was present upon the occasion when Loock's heirs came together, at which time he was twenty years old; that an auction was then held; that Bonnie Look wanted to purchase the entire tract, but George Look wanted a forty; that after a number of bids were made the entire tract was awarded to Bonnie; that George said he wanted a forty; that Bonnie said he was agreeable to this but that the north forty was not on a road; that Bonnie said if George would take the north forty Bonnie would give him a right of way out on the old road across the south forty; that George wanted the south forty, and said that if Bonnie would take the north forty George would put a gate at the line fence where the road entered the north forty from the south forty and give Bonnie a right of way forever through the south forty; that Bonnie then agreed to let George have the south forty; that from then on until the time of his death Bonnie used the roadway every year; that witness has used it for forty-six years; that from the time the north forty was acquired, witness' father and witness worked the road and kept it passable, such work consisting of cutting down brush and overhanging branches of trees and hauling cinders and doing graveling and grading to fix washouts; that at one time George's sons, who then owned the south forty, asked witness' permission to put padlocks on the gates to protect their corn from cattle, offering witness a key, and that witness agreed and was given a key.

John G. Look, son of George, a witness for appellants, stated on direct examination, in answer to a question as to whether Look ever had any interest in the roadway: "Not that I know of, but they used it. During the time we owned it we didn't give them permission to use it. There was nothing said. We kept the gates up on either side of the property." On cross-examination he stated: "When

I speak of keeping up the gates I refer to the inside gates as well as the gate on the public road and the one that divides this place from the Evert Look place. We had the whole fence between us and Evert Look on the north side that divides that forty from the Evert Look place. We took care of all of it and the gate was a part of what we had to take care of. That gate has been there as long as I know." Witness further testified that they once put a crop of wheat across the road, but it was not done for the purpose of keeping appellee out.

Lammert Look, another son of George, testified that the road was plowed up and wheat was planted but witness told appellee to go on through; that appellee crossed through there for thirty years and never asked consent; that "he went right along and used it," and that there was a gate in the fence "and we kept that gate up."

Appellant Lammert Bruninga testified that there were wagon tracks as far as the house and beyond it, up over the hill, twenty-six years ago, and a gate on the north side as long as witness could remember; that he was not on friendly terms with appellee; that he hauled a load of ground feed through there and had trouble going through the creek and asked appellee to fix the road; that appellee did not go down and fix it so witness could get through, but that the time before that witness got stuck, and appellee went down and fixed it without witness telling him.

Andrew and Warner Harkens testified to having known the property for over forty years and to having observed appellee's continuous use of the road. Andrew stated that he had helped appellee to work it, hauling cinders and gravel on it and filling up holes. Warner testified to having seen crops on top of the hill on the south forty but that there were never any crops in the road, and that "they crossed the road with a harrow but they never plowed the road."

The master and chancellor found that upon the occasion of the auction George Look agreed that if he were per-

mitted to have the south forty Bonnie Look could have a right of way over the south forty forever; that as a result of this agreement Bonnie permitted George to purchase the south forty; that over fifty years prior to the present proceeding there was established a clearly defined right of way over the south forty to the north forty; that this right of way was established by the heirs of appellee's grandfather for the purpose of a roadway permitting ingress to and egress from the north forty; that this right of way had been used continuously by the owners of the north forty since its inception and as appurtenant thereto; that Antje Bruninga resides on a piece of land immediately adjoining the south forty on the east and from her dooryard can observe approximately this entire right of way and has known for thirty-nine years that it was being used for the purpose of ingress to and egress from the north forty; that appellee has shown an open, visible, adverse, continuous and uninterrupted use of the right of way for over twenty-five years under a claim of right and with the knowledge and acquiescence of the owners of the south forty, and that he has acquired a prescriptive right to use the right of way and has thereby established an easement over the south forty which is appurtenant and appendant to his property. The decree restrained appellants from interfering with appellee's free and complete use of the right of way.

Appellants contend that no effect can be given to the agreement made between Bonnie and George Look at the time of the auction because it was void under the Statute of Frauds. In so far as the contention means that the agreement cannot be enforced as such, it is, of course, meritorious. To say that the agreement cannot be taken into consideration in any way at all, however, is going too far. This court considered a very similar situation in *Schmidt* v. *Brown*, 226 Ill. 590. In that case there were involved two adjoining tracts of land, designated as the Brown farm and the Smith farm. The Brown farm lay to the north

of the Smith farm. At the time the elder Smith acquired his farm, in 1851, a road ran north and south through it, extending to the line between the two farms. Smith built a house and barn on the south portion of his holdings, placing the house on one side of the road and the barn on the other. The Brown farm house was near the division line between the Smith and Brown farms. Testimony indicated that since 1843 the road had been used for travel to the Brown farm. It was kept in repair by the Browns. In 1883 one Kennedy, who owned land south of the Smith farm and over which both Smith and Brown had enjoyed a road out south, threatened to close up the way. Smith asked Brown to negotiate with Kennedy to buy a roadway over the Kennedy land, telling Brown that if he would help to do so he should always have a way over the Smith land and should "never be shut up" over the Smith land. Brown secured the road from Kennedy. In 1886 Smith obtained permission from the Browns to place certain gates across the road on the Smith farm, but there was thereby no interruption of its use. In 1905 Henry Schmidt acquired the Smith farm and forbade the Browns to use the road. We held that the Browns had acquired a prescriptive right to use it. We said that it might well be doubted whether the use prior to 1883 was under a claim of right. Holding that the parol agreement between Smith and Brown made in 1883 "was utterly void under the Statute of Frauds," we commented on the fact that after it the Smiths recognized the right of the Browns to use the road and applied to the Browns for permission to put in the gates and straighten a portion of the way to put the Smith land in more convenient shape for cultivation. We said: "Even though the contract was void because not executed in conformity to the Statute of Frauds, yet such contract may serve to show that Brown's user was under a claim of right. The claim of right which enters into every case of adverse enjoyment need not be a well founded claim—it need only be a claim

of right. A user under a contract void under the Statute of Frauds is a good claim of right. * * * Brown's use of this road was adverse, uninterrupted, continuous and exclusive and under a claim of right. The fact that other persons also used the roadway does not prevent Brown's user from being exclusive. 'Exclusive use' does not mean that no one used the way except the claimant of the easement. It means no more than that his right to do so does not depend on a like right in others. The use may be exclusive, within the meaning of this rule, even though Smith and others also used the road. * * * We are of the opinion that the agreement, and the user under it for more than the requisite period, together with the clear recognition of Brown's rights by the owners of the Smith farm, warranted the court below in refusing appellant's second proposition of law, in which the court was requested to hold that such agreement only operated as a license."

A similar problem was presented in *McKenzie* v. *Elliott,* 134 Ill. 156. In that case we held that where a party purchased a lot of ground upon the assurance that a strip sixteen feet wide should be left as an alley adjoining the lot, which strip was then staked off and the purchaser erected buildings and fences on the line of the lot with reference to the alley and used and improved such strip under claim of right for twenty years, such purchaser acquired a right of way over the alley by prescription. We said: "It is said that the defendant in error used the alley by permission of the owners, and therefore that her possession was not adverse. The testimony shows that the defendant in error would not have bought the lot without the use of the alley, that such use was a part of the consideration for the purchase, and that both Frederick Gritzner and his son Charles told her the strip was to be kept open as an alley. They and their grantees acquiesced in her use of it for more than twenty years. We cannot see that the use was any more permissive than if there had been a writ-

ten grant of the easement. It is true that a right of way cannot be gained by the parol agreement of him who creates it, but where under such agreement the way has been used for twenty years with the acquiescence of the owner, a prescriptive right to the same has been thereby gained."

The above cases are decisive of the issue here. The master and chancellor were well warranted in finding that the north forty was purchased as the result of an agreement whereby its purchaser was to have a right of way forever over the south forty. The evidence amply shows that there was thereafter a continuous user of the right of way under claim of right based on this agreement. Appellee and his father worked the road and kept it in repair. Appellants' predecessors in title maintained gates which were erected in connection with its use, asked permission to lock them, and cultivated the land in a manner which accorded recognition to the rights of appellee. While the owners of the south forty also made some use of the road, the same element was present in the *Schmidt case* and was held not to prevent the use by the owner of the dominant tenement from being exclusive.

*Dexter* v. *Tree,* 117 Ill. 532, and other cases laying down the rule that where the proprietor of land has a private way through his own land and for his own use the permissive use of it by others will confer no rights upon them, were urged upon us in the *Schmidt* and *McKenzie cases* and are relied upon here. We held that they were not applicable there, and for the reason that the finding here properly was that the user was under a claim of right we hold that they are not applicable to the case at bar.

Appellants insist that this case is governed by *Morse* v. *Lorenz,* 262 Ill. 115. It was there held that an oral agreement by the owner of a lot to allow water pipes and sewer to be laid through such lot and maintained until such time as water pipes and sewer should be laid in a certain street is within the Statute of Frauds and is a mere license,

revocable at will. The case of *Schmidt v. Brown, supra,* was there taken into account, and we distinguished it by pointing out that it involved a user under a claim of right, which was therefore adverse under the Statute of Limitations. It is unnecessary to say more than that we are here dealing with a situation similar to that in the *Schmidt case.*

Appellants contend that *Bontz v. Stear,* 285 Ill. 599, is decisive here. That case applied the principle that verbal permission to pass over the land of another cannot ripen into a prescriptive right. It has no application where the facts disclose user which is not by mere permission but under a claim of right.

Appellee's father joined in the warranty deed conveying the south forty to George Look. Appellants contend (1) that the agreement for the right of way cannot be considered because it alters the terms of a sealed instrument subsequently executed; and (2) that appellee is estopped by the warranty of freedom from incumbrances to assert that there was any easement for right of way when the deed was executed. These contentions are without merit. We have already stated that appellants are warranted in insisting that the parol agreement was void and in itself vested the owner of the north forty with no rights whatever. Consequently there is no agreement in existence to vary the terms of a sealed instrument. There was no breach of the covenant against incumbrances, because no incumbrance by way of easement was in existence when the deed was executed. Appellants insist, nevertheless, that *Biwer v. Martin,* 294 Ill. 488, is decisive in their favor. In that case we held that where a grantor by warranty deed conveys a life estate to his son, with certain contingent remainders in fee, one who subsequently acquires the grantor's reversionary interest by a sheriff's deed cannot destroy the contingent remainders by conveying his interest to another who has acquired the life estate, as the grantor's warranty of title is binding on one who subsequently acquires his interest

and will estop him from destroying the interest of the contingent remaindermen. We said: "If it is sound doctrine—and we believe it is—to say that where the grantor conveys an estate he does not own, such estate is to pass under his covenants by way of estoppel when acquired by him, we can see no reason why such grantor should not be estopped to breach his covenants of warranty by an act of conveyance, which would have the effect of defeating the remainder granted by him." We there referred to the "equity and good conscience" of allowing a grantor to "destroy by conveyance" a right created by him by deed with covenants of warranty. Here there is no question of breaching any covenant by any act of conveyance. Nor can there be any question of the equity and good conscience of giving effect to rights which vested by operation of law long after the conveyance and with the full acquiescence of those against whom they arose.

Appellants contend, lastly, that equity has no jurisdiction of this case, citing *Oswald* v. *Wolf*, 129 Ill. 200, and *City of Pana* v. *Central Washed Coal Co.* 260 id. 111. Those cases dealt with bills to restrain private nuisances and have no application here. The jurisdiction of equity to restrain interference with the enjoyment of easements under such circumstances as are here disclosed is well established. *Cihak* v. *Klekr*, 117 Ill. 643; *Smith* v. *Young*, 160 id. 163; *Espenscheid* v. *Bauer*, 235 id. 172; *Messenger* v. *Ritz*, 345 id. 433.

The decree of the circuit court is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*