The Fair, a Corporation, and Lytton's, Henry C. Lytton and Company, a Corporation, Appellees, v. The Evergreen Park Shopping Plaza of Delaware, Inc. et al., Appellants.

**Gen. No. 46,459.**

First District, First Division.

December 13, 1954.

Rehearing denied January 4, 1955.

Released for publication March 7, 1955.

Sonnenschein, Berkson, Lautmann, Levinson & Morse, and Sidley, Austin, Burgess & Smith, of Chicago, for appellants; Bernard Nath, George Ragland, Jr., Howard P. Robinson, Edwin A. Rothschild, C. Harker Rhodes, Jr., and H. Blair White, all of Chicago, of counsel.

Wilson & McIlvaine, and Ettelson & O'Hagan, of Chicago, for appellees; Thomas C. Strachan, Jr., W. S. Bodman, Robert E. Samuels, and F. A. Reichelderfer, all of Chicago, of counsel.

MR. JUSTICE NIEMEYER delivered the opinion of the court.

All defendants appeal from a decree directing that a mandatory injunction issue ordering defendants The Evergreen Park Shopping Plaza of Delaware, Inc. (hereinafter called Evergreen) and Carson Pirie Scott & Company, a corporation (hereinafter called Carson) "to remove that part of the existing store front of Carson which is an obtrusion on the mall north of Building B in Evergreen Park Shopping Plaza and directing said defendants to replace the pavement and wall of said building so that the north line of Building B is a straight line without any obtrusion thereon," and taxing all costs of the litigation against defendants.

Evergreen is the owner of Evergreen Park Shopping Plaza, a shopping center in Evergreen Park at the

southwest corner of 95th street and Western avenue, the dividing line between Chicago and the suburb. Carson and the plaintiffs, The Fair and Lytton's, Henry C. Lytton & Company, a corporation, hereinafter called Lytton, are tenants operating department stores in the Plaza. They are competitors. Evergreen was promoted by defendant Arthur Rubloff, who is its president and chairman of defendant Arthur Rubloff & Company, its corporate manager. In the beginning Rubloff and his associates operated as an unincorporated association. The leases to plaintiffs were negotiated by Rubloff and signed by Arthur Rubloff & Company as agent for the association. By mesne conveyances Evergreen became the owner of the Plaza property, subject to leases to plaintiffs.

The Plaza covers 20 to 25 acres. We are concerned only with that part which extends south from 95th street to 97th street and west from Western avenue about 500 feet. Streets and alleys formerly in the area have been vacated. In the northeast corner on the main or upper level is a large rectangular parking area accommodating 550 cars. Building A extends south from 95th street about 600 feet. It is west of the parking area and parallel to Western avenue. Its east or front building line is straight, except for Walgreen's store at the northern end which is set forward 44 feet east of the other stores in the building. At the opposite or southern end is the department store of The Fair.

The Fair store is the largest and most prominent store in the Plaza. Its main entrance faces east toward Western avenue, along the mall or sidewalk immediately north of Building B. This building extends east to west parallel to 95th street, from Western avenue to the mall in front of The Fair store. It is 346 feet in length. Kroger's Super Market occupies the easterly 116 feet, Carson has 130 feet immediately west, and Lytton 100 feet at the western end. There is a mall

between Lytton's and The Fair store. Building C is 24 feet north of the north building line of Building B as it existed before Carson erected a bay, described in the decree as the "obtrusion on the mall," extending 5 feet north of the original building line. Building C is parallel to building B and is 180 feet or more long. It is opposite the entire front of the Carson store and part of the Lytton and Kroger stores. It is occupied by smaller stores. South of Building B is a lower-level parking area extending to 97th street. There is an escalator in the Lytton and Carson stores to carry people from the lower level to the main level of the respective stores.

The Fair was the first tenant of Evergreen. The lease, dated September 22, 1950, is for a term of 25 years with an option for an additional 15 years. It was not to become effective until certain plans, drawings and specifications had been furnished to The Fair and approved by it. By amendment dated April 16, 1951 a site plan, revised January 12, 1951, was incorporated in the lease by reference. This site plan showed a straight front building line for Buildings A, B and C, except for the projection of the Walgreen store in Building A. It also appeared from the plan that the locations of the pickup stations for Kroger, and for Jewel, a tenant in Building A, shown thereon, were not final. The Kroger pickup station was 24 feet north of the Kroger store and near Western avenue. It was finally located 19 feet 2 inches north of Building B. The Jewel pickup station was near 95th street and has no bearing on the issues in this case.

The Lytton lease, dated December 30, 1950, is for a term of 10 years with an option to renew for an additional 15 years. Attached to and made a part of the lease was a site plan, as revised December 20, 1950, which was in all material matters the same as the plan incorporated in The Fair lease. It showed that

458

the parking area north of Building C was to be revised. This revision was either made or abandoned before February 16, 1951, the date of the site plan in The Fair lease. The notation is not on that plan.

Each lease provided for the construction and maintenance of areas for parking and malls, to be used by the tenants in common with the landlord and all other tenants. In The Fair lease the lessor agreed to construct and maintain "an area for parking and mall to connect with the demised premises (all hereinafter called 'parking area')," to be located in accordance with the upper-level site plan as revised February 16, 1951, incorporated by reference in the lease as amended, and the lessor leased and demised to the tenant the parking area therein described and such parking areas as might be added thereto from time to time thereafter for the term of the lease and any renewal, for use by tenant, its employees, agents, customers and invitees in common with use by the landlord and all tenants, their employees, agents, customers and invitees. The Lytton lease was not as explicit. By it the lessor agreed to construct a parking area and mall approximately as shown by the site plan as revised December 20, 1950, to be available to all tenants, their employees, agents, customers and invitees. In each lease the respective tenant bound itself to pay its proportionate share of the cost to the landlord of operating, lighting, cleaning, removing snow, policing and otherwise properly maintaining the parking areas, malls and other areas common to all tenants, but not more than the sum stated in the lease.

The buildings in the Plaza were not ready for occupancy by plaintiffs until the latter half of 1952. The Fair store opened for business in August, and Lytton in the following month. In June 1952 Rubloff began negotiations to obtain Carson as a tenant. July 24, 1952 Carson submitted to Rubloff a letter outlining

the conditions under which it was prepared to lease the space in Building B between Lytton and Kroger. One of the conditions was that "the upper level entrance to extend opposite electric stairway landing for 5 feet north of the present building line, and for approximately 50 feet east and west on this line, such entrance to be designed for glass construction." Carson expressly stated that "This proposal assumes a final lease satisfactory to both parties." Rubloff immediately endorsed his acceptance on the letter. A lease was prepared providing for the extension of the front 5 feet north of the "present building line," and signed by Rubloff on behalf of lessor September 20, 1952. Two days later the construction of the bay began.

The manager of Lytton's store notified Cole, president of the company, and a protest was made September 22, 1952 to Rubloff. On the same day Rubloff notified Carson of Lytton's protest. He immediately conferred with Cole and Suyker, president of the Fair, who insisted that the proposed erection of the bay would be a violation of their rights under their respective leases and that work on it should stop. These conversations were immediately reported to Carson. On October 2, 1952 Carson signed the lease. Attached to this lease are two site plans. The first, revised as of May 10, 1952, shows a straight north building line for Building B; the second, revised for Carson September 16, 1952, shows the Carson bay extending north of the building line. A week later, October 9, 1952, a complaint for injunction was filed. In addition to the defendants hereinabove named, the architectural firm which supervised the construction of the Plaza and of its constituent stores, the general building contractor for the Plaza and its stores and the corporation which provided financing to Evergreen were made defendants. During the pendency of the suit Evergreen and Carson completed the bay.

The Carson bay projects five feet from the building line of Building B into the mall shown on the plans incorporated in plaintiffs' lease and as originally constructed by Evergreen. It is about 48 feet long. At each end is a diagonal entrance to the store 15 feet or more in length. At the top of each entrance is Carson's name, visible from either end of the mall. The western entrance is adjacent to the Lytton store. The bay and the entrances are glass. The entire bay is a show window, displaying Carson merchandise.

The presidents of the respective plaintiffs testified that permitting a store to extend beyond other stores violates a fundamental law of retail merchandising. Cole testified further that he did not know an instance where in the same building one front protruded beyond the other fronts; that it gives the protruding store an advantage over its neighbor in the advertising that is presented in its windows, and the prominence of the entrances, making it easier for a person to go into one store than the one next door. Defendants called experts who testified that the projecting bay and show window gave no retail merchandising advantage to Carson. There is evidence intended to show that the extension of Carson's store front into the mall was in part, at least, a public safety measure. Representatives of Carson testified that the space between the escalator and the original north wall was not adequate to permit the circulation of customer traffic. Rubloff testified that an official of Carson told him that Carson had determined that the escalator was so far forward that if they were to merchandise the space properly the rush of traffic would be such that it would create a hazard to public life and limb. This testimony is destroyed by a Carson exhibit showing a sales counter for handbags and gloves directly in front of the escalator exit. This counter is 36 feet long and is placed 4½ feet south of the original north wall of the store. There

461

is no evidence of probative value as to the cost of moving the escalator. There is testimony that in a conference following plaintiffs' protest against the bay, representatives of Evergreen said it would cost $50,000 to relocate the escalator, and that Suyker said the work could be done for $5,000 and he would take a contract to do it for $10,000.

There is testimony to the effect that the bay interferes with persons entering the Plaza from Western avenue or going from plaintiffs' stores to Western avenue, particularly during the busy or peak hours. This is disputed by defendants' experts. It is also suggested that the bay lessens the shelter afforded pedestrians in hot or inclement weather by the canopy roof which extends 12 feet into the mall from the building line by reducing the passageway under the canopy at the bay to only 7 feet.

Plaintiffs say that the fundamental issue in the case is whether the plaintiffs acquired a property right in the sidewalk space shown on the plats incorporated in plaintiffs' leases, and that the leases created an easement permitting the use of that space for ingress and egress of persons to and from plaintiffs' stores and to and from the parking areas and public streets. Defendants contend that "the leases contemplated a reasonable development of the yet-unconstructed shopping center; the site plans in the leases were merely the current revisions of plans which were continually being revised. All that the leases required was that the parking areas and malls should be constructed in substantial and approximate compliance with the site plans." They argue that the fact the project was a drive-in shopping center, precludes any notion of unchanging rigidity in development; that each shopping center is in a way an experiment the conduct of which requires at least reasonable flexibility.

We recognize the necessity of changes as a project the size of the Plaza moves from the drawing board to

462

completion, and acknowledge the right of an owner to revise and revise up to but not beyond the point where the revision conflicts with rights previously granted to tenants or others. The rights of the parties to this litigation must be determined by the provisions of the leases, not by the necessities of the owner in developing its project. The Fair lease provided specifically that it was not to become effective until certain plans, drawings and specifications, referred to as exhibits A, B, C and D, had been furnished to and approved by The Fair. None of these exhibits was actually attached to the lease. Exhibits A, B and C were plans to locate and describe the demised premises. Exhibit D was a site plan to show the location and dimensions of buildings, parking areas and malls. Evergreen expressly reserved the right to make some minor variations from the plans for the store to be occupied by The Fair. There was no reservation of a right to make any changes with respect to the parking areas or malls. By amendment of the lease April 16, 1951 a site plan as revised February 16, 1951 was incorporated in the lease in lieu of exhibit D. This site plan was drawn to scale and showed the location and dimensions of the buildings, parking areas and malls. It was, for purposes of fixing the rights of the parties to the lease, a final plan except as to the location of pickup stations, concerning which it bore the notation, "Location of pickup stations not final." No other exception to the finality of the plan was noted on the plans or reserved in the lease.

As hereinbefore stated, a site plan as revised December 20, 1950 was incorporated in the Lytton lease. It was in all material matters the same as the site plan incorporated in The Fair lease. By the Lytton lease, Evergreen agreed to construct a parking area and mall "approximately as shown" on the site plan attached thereto. No other right to deviate from the plan in the

463

construction and placing of parking areas or malls is reserved.

The location and dimensions of the mall north of Building B were definitely fixed by the site plans attached to the respective leases. These plans fixed the north building line of Building B as a straight line, and the mall north of this line as 24 feet in width, extending from building line to building line between Buildings B and C. Evergreen erected Building B and laid the mall to the north in accordance with these plans. When plaintiffs opened their stores, in August and September 1952, the mall was 24 feet wide the entire length of Building B, except for the encroachment of the Kroger pickup station at the eastern end, a right reserved by the notation on the plans. After Carson and Evergreen had agreed on a lease providing for an extension of the front of the Carson store five feet into the mall and Rubloff had signed the lease on behalf of Evergreen on September 20, 1952, the part of the mall immediately north of the building line of Building B was torn up and the bay, or extension, erected.

The question before us is not Evergreen's right to provide malls substantially and approximately in accordance with the site plans, as contended by it. The question is Evergreen's right to change and alter a building line and mall constructed in accordance with the plans.

■■ Every tenant in the Plaza except Walgreen and Kroger is entirely surrounded by property owned by Evergreen and has no means of ingress or egress for itself, its employees, agents, customers and invitees except upon and over property owned by Evergreen. The right of ingress and egress upon and over the property of Evergreen is essential to the full beneficial use and enjoyment of the demised premises—the part occupied by the stores of the respective tenants. It is an easement appurtenant to the demised premises and

passes by a lease without any additional words. 32 Am. Jur., Landlord and Tenant, sec. 169.

The easements acquired by plaintiffs were not left to implications of law. They are specifically granted and defined in the leases to the respective plaintiffs. The language of The Fair lease creating the interest which is the subject matter of this litigation is as follows:

"Landlord agrees to construct and maintain curb cuts and driveways and *an area for parking and mall* to connect with the demised premises (all hereinafter called 'parking area') in said Evergreen Park Shopping Plaza, to be located in accordance with . . . (site plan revised February 16, 1951, hereinbefore referred to), which said site plan is incorporated herein by reference. *Landlord hereby leases and demises to tenant the parking area hereinabove described,* and such parking areas as may be added thereto from time to time hereafter . . . for the term of this lease and any renewal term for use by tenant, its employees, agents and invitees in common, with use by landlord and by all tenants in said Evergreen Park Shopping Plaza, their employees, agents, customers and invitees . . . ." (Emphasis added.)

Landlord further agreed to manage and operate the parking area during the term of the lease and any renewal term, but not as agent of tenant; to keep tenant insured against all statutory and common-law liabilities for damages on account of injuries, including death, sustained by any person or persons while within the parking area or other areas immediately adjacent thereto, or on account of damages to property. Tenant agreed to pay on demand, "as further rent," its proportionate share of the actual cost to the landlord, but not to exceed $25,000 per lease year, for operating, lighting, cleaning, removing snow, policing or otherwise properly maintaining the parking area.

465

Defendants contend that "the only right given to The Fair is the right to use, in common with the landlord and all the other tenants, whatever parking areas might be established on the Plaza from time to time during the term of the lease" and that "there was no grant of easement."

As an easement creates an interest in land it must be founded on a deed or other writing, or on prescription, which presumes a previous grant. Brunotte v. DeWitt, 360 Ill. 518. It may be created by covenant or agreement as well as by grant, for such agreements are in legal effect grants. Goodwillie Co. v. Commonwealth Elec. Co., 241 Ill. 42. No particular words are necessary to constitute a grant, and any words which clearly show an intention to give an easement which is by law grantable are sufficient to effect that purpose. Chicago Title & Trust Co. v. Wabash-Randolph Corp., 384 Ill. 78. The agreement must be construed so as to carry out the plain intent of the parties. Barber v. Allen, 212 Ill. 125.

It is immaterial whether the lease and demise to The Fair of the parking area shown on the site plan incorporated in the lease and parking areas to be added from time to time created a technical lease of those areas for use by The Fair, its employees, agents, customers and invitees in common with use by the landlord and all tenants in the Plaza. Without an easement in the parking areas, which, by the express terms of the lease, include the malls, the occupancy of the store would be valueless and without purpose. To give that easement, the landlord leased and demised the parking areas shown on the site plan and such parking areas as should be added from time to time thereafter for the use stated in the lease. It is estopped to assert that the lease and demise is in legal effect less than a grant. The use granted is an exclusive use of the parking areas although the use is to be shared with the land-

466

lord and all other tenants in the Plaza, their employees, agents, customers and invitees. In Schmidt v. Brown, 226 Ill. 590, the defendants claimed an easement by prescription in the use of a private road leading from their farm to the public highway. As stated by the court, to establish a way by prescription the claimant must show an adverse, uninterrupted, exclusive and continuous use under claim of right. After reviewing the evidence the court said (p. 599):

"Brown's use of this road was adverse, uninterrupted, continuous and exclusive and under a claim of right. The fact that other persons also used the roadway does not prevent Brown's user from being exclusive. 'Exclusive use' does not mean that no one used the way except the claimant of the easement. It means no more than that his right to do so does not depend on a like right in others. The use may be exclusive, within the meaning of this rule, even though Smith and others also used the road." (Authorities cited.)

In McKenzie v. Elliott, 134 Ill. 156, the court quotes with approval from Washburn's Easements and Servitudes (4th ed.) page 164, sec. 44, as follows:

"It would seem that it is not necessary that the one who claims the easement should be the only one who can or may enjoy that or a similar right over the same land, but that his right should not depend for its enjoyment upon a similar right in others, and that he may exercise it under some claim existing in his favor, independent of all others."

See Rush v. Collins, 366 Ill. 307; Leesch v. Krause, 393 Ill. 124. ■ The agreement of the landlord to manage and operate the parking areas, but not as agent of the tenant, is not, as defendants contend, inconsistent with a grant of an easement. The maintenance and operation

467

of the parking areas are essential to the full exercise of the easement and are at all times a matter of contract between the parties. The arrangement hereinbefore stated is plainly intended to protect the tenant from all liability arising out of the management and opera- tion of areas used by the tenant in common with the landlord and other tenants. For this protection and the services to be rendered, the tenant agreed to pay, "as further rent," a sum in addition to the amount specified as rental for the demised premises.

■ The easement in the mall north of Building B is an easement in land the exact location and dimensions of which were fixed by the site plan. The Fair is entitled to the use of the entire mall. Doan v. All-good, 310 Ill. 381. In Wurlitzer Co. v. State Bank of Chicago, 290 Ill. 72, the right of passage in a private alley was involved. The exact location, length and width of the alley were shown on a recorded plat which was referred to in an agreement of the parties providing that the land platted as a private alley should forever remain for the free passage and right of way of all and every owner and occupant of the subdivision. An owner of adjacent property erected pillars, narrowing the alley 1 foot 11 inches at one end and 2 feet 1⅝ inches at the other. The Supreme Court said (p. 82):

"The right to the land in question being a right of passageway and the boundaries of said land being defined, it follows that the right of passageway existed as to all the land within those boundaries, and appellee had no right to obstruct any portion of it by placing thereon upright supports or pillars. Where a right of passageway is granted over a strip of land having definite boundaries, such right extends to the full width of the tract described. (George v. Cox, 114 Mass. 382.) The chancellor did not err in finding that the pillars placed in said alley by appellee were obstructions and ordering their removal."

Although differing in language, the Lytton lease is in legal effect the same as The Fair lease. Under the former, the landlord agreed to build in the Plaza, buildings and improvements "in substantial compliance" with drawings of its architects and engineers as shown on plans attached to the lease, and to construct a parking area and mall in the Plaza "approximately as shown" on a site plan attached to the lease. The site plan was identical with the plan attached to The Fair lease in showing the front building line of Building B and the location and dimensions of the parking area and mall. The landlord fulfilled these obligations. The Building B and the mall immediately to the north were constructed in accordance with the plans. By the provisions of the lease the parking area and mall were to be "available to all tenants in Evergreen Park Shopping Plaza, their employees, agents, customers and invitees." There is no reservation of a right of the landlord to change the building line of the building or the location and dimensions of the mall after their construction. Ingress and egress to and from the Lytton store over the mall is an easement appurtenant to the demised premises—the part of Building B occupied by the Lytton store. The Lytton easement is in land the boundaries of which are defined by the lease, and Lytton, like The Fair, has an easement in the entire mall and is entitled to unobstructed use of all of it.

 Lytton and The Fair suffered similar damages. The Carson bay reduced the width of the mall for the length of the extension more than 20 per cent. It gave Carson an advantage over plaintiffs, its competitors, in the display of merchandise and the placing of the Carson name over each projecting entrance into the store. The advantage was a retail merchandising advantage, and the resulting damages are impossible of actual compensation. The injury is a continuing one. The remedy for the obstruction or reduction of a pri-

vate passageway is by injunction. There is no adequate remedy at law. Carpenter v. Capital Elec. Co., 178 Ill. 29. Evergreen had actual notice of plaintiffs' rights under their leases. Carson knew or was put on notice as to plaintiffs' rights when it began negotiations for its lease. The erection of the bay was intentional, after plaintiffs had objected on the first day the work started. The bay was completed during the pendency of this suit. There are no equities in favor of the defendants and no occasion for balancing equities. Gerstley v. Globe Wernicke Co., 340 Ill. 270; Pradelt v. Lewis, 297 Ill. 374. The decree taxed the costs against all defendants. No alleged error in taxing the costs is argued. The error if any is waived.

The decree is affirmed.

Affirmed.

BURKE, P. J. and FRIEND, J., concur.