PACEMAKER FOOD STORES, INC., Plaintiff-Appellee, *v.* SEVENTH MONT CORPORATION *et al.*, Defendants-Appellants—(Brookwood Energy & Properties, Inc., *et al.*, Defendants).

Second District   Nos. 82—921, 82—922, 82—960 cons.

Opinion filed August 22, 1983.—Rehearing denied September 22, 1983.

Elmer C. Rudy, of Williams & McCarthy, of Rockford, for appellant McDonald's Corporation.

Robert A. Fredrickson and Jan H. Ohlander, both of Reno, Zahm, Folgate, Lindberg & Powell, of Rockford, for appellant Mulford Village Development Co.

Edward M. Maher, of Paddock, McGreevy & Johnson, of Rockford, for other appellants.

Thomas Street, of Street & Larson, and Harold L. Turner, both of Rockford, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:
Defendants Seventh Mont Corporation, Montgomery Ward Development Corporation, Montgomery Ward & Company, McDonald's Corporation, and Mulford Village Development Company appeal an order granting injunctive relief to the plaintiff, Pacemaker Food Stores, Inc. The injunction, entered following a bench trial, prohibited the use of an easement across a shopping center parking lot connecting a four-lane street to a service road. The following issues are presented for review:

> 1. Whether, pursuant to its unrecorded lease and the plot plan attached thereto, the plaintiff secured an easement for parking that included the northeast corner of the shopping center's boundaries.

2. Whether the trial court's finding that Mulford Village and McDonald's had notice of the plaintiff's purported easement was contrary to the manifest weight of the evidence.

3. Whether there was a proper basis for the equitable relief granted by the trial court.

4. Whether the trial court erred in refusing to require testimony from the president of the plaintiff corporation, who had negotiated the lease upon which the equitable relief was based.

5. Whether the trial court erred in denying a motion to dismiss Montgomery Ward & Company as a party defendant.

At issue are two allegedly conflicting easements located in the corner of a shopping center parking lot. The 20-acre shopping center is located in Rockford, Illinois, on the northwest corner of the intersection of East State Street, which runs east-west, and Mulford Road, which runs north-south. Both are four-lane roads. There are two entrances to the shopping center from State Street, one cut into the shopping center and one adjoining the shopping center on the west, over which the shopping center has an easement. There are also two entrances on Mulford Road, both belonging to the shopping center, and one of which is at the extreme northeast corner of the shopping center and is controlled by a traffic signal. The southern Mulford Road entrance has a curb cut; the other three entrances have a curb and median cut. Directly north of the shopping center and adjoining Mulford Road are three platted lots of Mulford Village Annex. The lot nearest the shopping center is undeveloped, the middle lot is the site of McDonald's restaurant, and the northern lot has a gas station on it. There is an access road to the three lots that runs parallel to Mulford Road. The northern end of the access road opens onto Mulford Road without traffic controls, and the southern end is connected to the shopping center's northeast entrance. The easement in question in this case is a 74 feet by 74 feet square in the northeast corner of the shopping center's parking lot that permits this access. The shopping area is in a rectangular building located near the northern boundary of the 20 acres and running east and west. The plaintiff's store is located in the southwest corner of the building. A diagram showing the layout of the area follows.

MULFORD VILLAGE ANNEX
BUILDINGS OF ADJOINING OWNERS
PRIVATE ROAD OF ADJOINING OWNERS
EXISTING PACEMAKER STORE

LOT 1

LOT 2

LOT 3
MULFORD VILLAGE DEVELOPMENT
CORPORATION

MULFORD VILLAGE ANNEX

MONTGOMERY WARD
STORY

PACEMAKER
STORE

MULFORD ROAD

SHALL
OIL
STATION

US ROUTE 20

EAST STATE STREET

SITE PLAN
SCALE 1"=50'-0"

This lawsuit was instituted in March 1981, when a retaining wall on the northern boundary of the shopping center within the purported easement area was broken for purposes of building an access road from the north connecting the service road and the northeast entrance to the shopping center. Pacemaker filed an equitable action seeking to enjoin interference with egress and ingress to the shopping center. Following amendments, the plaintiff's complaint was dismissed with prejudice by the trial court on the ground it failed to state a cause of action. We reversed that judgment in a Rule 23 order (102 Ill. App. 3d 1203) directing the trial court to permit plaintiff to file its second amended complaint. It did so. A bench trial followed at which this evidence was adduced.

On August 11, 1970, Monwar Property Corporation entered into a lease with Pacemaker Food Stores, Inc., for the rental of a section of the shopping center. The lease was extended the following year by Montgomery Ward Development Corporation, which was formerly known as Monwar Property Corporation. In November 1972, Seventh Mont Corporation, as the then fee owner, entered into a lease with Montgomery Ward & Company for the rental of the remaining portion of the shopping center. In August 1976, Brookville Energy Properties, Inc. (now Brookwood Energy & Properties, Inc.), as the then fee owner, extended the lease with Pacemaker Food Stores, Inc., with the concurrence of Montgomery Ward & Company and Montgomery Ward Development Corporation. The plaintiff's lease with options has over 20 years remaining.

Montgomery Ward & Company opened a retail shopping outlet to the public in November 1970. The plaintiff opened a retail grocery outlet in the shopping center in February 1971, and the store was run under the name of Logli Supermarkets. The plaintiff and Montgomery Ward & Company have remained the only tenants in the shopping center.

The plaintiff's lease agreement provided for entrances and parking as follows:

"Landlord covenants that Tenant and its customers, invitees and licensees at all times shall have adequate means of ingress and egress between each entrance to the leased premises and all public streets, highways, and alleys adjoining the real estate shown on Exhibit A.

Landlord grants Tenant, its customers, invitees and licensees the right and easement to use the entrances, parking areas, walks and driveways shown and designated on Exhibit A for the purpose of parking cars and ingress to and egress from the

leased premises, all in common with the occupants of the other existing or future improvements shown on Exhibit A and their customers, invitees and licensees."

Exhibit A, attached to the lease agreement, was a plot plan of the 20-acre shopping center, showing the location of a single building and showing perpendicular and diagonal hash marks that appear to represent parking stalls. The defendants challenged whether the perpendicular hash marks, located along the entire edge of the northern boundary, indeed represented parking areas. The trial court found the lease agreement to be ambiguous as to the delineation of the parking spaces and allowed parol evidence to be presented to ascertain the intent of the parties.

The plaintiff's vice-president, who was present during some lease negotiations, stated that there was a representation that parking would be provided based on a ratio to the square footage of the shopping area, but there was no representation made as to an actual number of parking spaces. He also testified that representations were made that there would be parking along the northern border. His understanding was that, where possible, parking was to be as shown on the architect's drawing.

There was testimony by an architect and surveyor that the perpendicular hash marks shown on exhibit A along the northern boundary of the shopping center represented parking stalls. It was also shown that the parking lot as actually painted varied from the diagram on exhibit A. The parking lines were painted on the lot either before the stores opened or shortly afterward. No lines were painted on the northern boundary at that time. There was testimony that the parking stripes appear today as they did when the lot was first laid out and that, after the two times the parking lot was resealed, the lot was restriped the same as it had been. Aerial photographs indicated that the northern boundary was not striped for parking in 1972 or in 1978. One witness testified that the original striping of the parking lot included spaces drawn on the northern lot line, but that was west of the 74-foot easement area. One witness testified that, while the northern lot line was never striped as depicted on the "As Built Site Plan," 23 lines were drawn on part of the northern boundary in 1978 or 1979 for use by employees. There was no testimony whatever that the northeast corner of the shopping center was ever actually painted for parking.

Exhibit A to the plaintiff's lease called for 1,336 parking spaces. Those actually painted totaled 1,161. No complaints were made by the plaintiff concerning the lack of delineated parking on the northern

edge of the lot.

The plaintiff's complaint alleged that the 74-foot easement encroached on 12 of the alleged parking spaces located in the northeast corner of the lot. There was testimony that the northern edge of the 74-foot easement lay over an area that contained eight of the alleged spaces that were represented on exhibit A but never striped. There was conflicting testimony by different witnesses as to whether the southern perimeter of the 74-foot easement encroached at all on four other parking spaces, which were in fact striped. The witness who agreed that there was an encroachment opined that there was a 2½-foot overlap of the four spaces as proposed on exhibit A, but there was no overlap on the southern parking spaces as actually painted. The plaintiff placed a sign in the area of the easement that slightly encroached on the parking spaces. For several years, there had been semi-trailers, a semi-flatbed, and bales of cardboard left on the western edge of the parking lot by the plaintiff.

When the parking lot was initially painted, the pavement at the northern boundary of the shopping center was increased from an eight-inch depth to 14 inches, in order to allow the area to be used by trucks at the roadway, and it was so used. Witnesses differed in their recollections of ever seeing any automobiles parked in the easement area.

In March 1980, Seventh Mont Corporation granted to the public and American National Bank and Trust Company an easement for roadway purposes in the 74-foot-square portion of the extreme northeast corner of the shopping center. This improved access to a roadway serving the lot to the north. Mulford Village Development Company sold lot 2 to McDonald's, including the roadway easement and the 74-foot-square easement. The sale was finalized in December 1980.

There was testimony that about $875,000 was invested in the McDonald's restaurant, that gross sales for the year were about $1.3 million, that 50% of the traffic to McDonald's came from the north and 50% from the south, and that 51% of customer visits were spontaneous. There was no traffic signal at the northern entrance to the frontage road. It was therefore concluded that closing the southern end of the frontage road would cause a loss of about 25% of McDonald's business and a loss of 16 to 20 jobs.

The plaintiff's vice-president could not provide particular facts that constituted irreparable harm to the plaintiff but suggested that it lay in traffic congestion and the loss of parking stalls. The plaintiff had plans for expansion to the west, which would affect parking spaces. The plaintiff paid about $200,000 a year in rent.

The plaintiff offered into evidence all pertinent recorded documents in the chain of title to the 20-acre tract, some of which referred to the plaintiff's lease. A declaration of subordination referred to "the lease dated August 11, 1970, between Monwar Property Corporation, as Landlord and Pacemaker Food Stores, Inc., as Tenant, as amended by the Supplemental Agreement dated August 3, 1971, covering real property located in the County of Winnebago and State of Illinois described as follows: Storeroom No. 1 ***." Financing statements also stated that they were subject to "Lease dated August 11, 1970, between Monwar Property Corporation and Pacemaker Food Stores, Inc., as supplemented by agreement dated August 3, 1971." The lease itself was never recorded, nor did the plaintiff ever file an assumed name certificate.

During the negotiations for the sale of lot 2 by Mulford Village Development Company to McDonald's, the attorneys agreed to use Chicago Title Insurance Company to examine and insure title to lot 2 as well as the 74-foot easement area. Chicago Title issued three title commitments concerning in part the easement area, dated April 15, 1980, June 9, 1980, and August 21, 1980, which the attorneys reviewed. The April 15 commitment set forth as exceptions to title to the 74-foot easement the plaintiff's lease, as disclosed by the recorded declaration of subordination, and stated that all existing unrecorded leases should be produced. The June 9 and August 21 title commitments omitted the specific reference to the lease but included the exception for all existing unrecorded leases. There was correspondence between McDonald's and Mulford Village Corporation with respect to these title objections regarding the need for an affidavit stating that there were no preemptive rights in the leases of the shopping center that would shut off McDonald's access to the easement right. McDonald's persuaded Chicago Title to release the exception to title for unrecorded leases based on a consent agreement obtained from Montgomery Ward and recorded. All documents recorded within the past two years affecting title were sent by Chicago Title to McDonald's. No one from McDonald's, Mulford Village Development Corporation, or Chicago Title obtained a copy of the plaintiff's lease.

The trial court ruled in favor of the plaintiff and issued a mandatory injunction against the defendants prohibiting the use of the 74-foot easement for roadway purposes and staying its order pending appeal. In its findings, the court noted that the evidence established that the plaintiff had an easement appurtenant for parking along the northern margin of the premises, that the parties to the lease intended that there be parking along the northern margin, and that

there was a sufficient delineation on exhibit A of the area for parking to define the easement; that the plaintiff had a legal interest in maintaining that area for parking, notwithstanding the right to use of the area by Wards and the actual use by Wards' customers or the fact that the plaintiff's customers may never have used the parking area; that the evidence established irreparable damage in that once the roadway was created over the north margin of the 74-foot area, the plaintiff lost the fruits of its bargain by losing the 12 parking spaces; that defendants, McDonald's and Mulford Village Development Company, had actual notice of the interest of the plaintiff and their reliance on Chicago Title did not establish their innocence; and that the failure to mark the parking spaces did not establish an abandonment of the parking easement by the plaintiff. From that order, the defendants appealed.

■ The first issue is whether, pursuant to its unrecorded lease and the plot plan attached thereto, the plaintiff secured an easement for parking that included the northeast corner of the shopping center's boundaries. The defendants posit that the evidence failed to establish that the plaintiff's parking easement attached specifically to the area across which the 74-foot easement was granted. They argue that the plot plan was not regarded by the parties as binding, noting that fewer parking spaces than diagrammed were actually painted, that they were not laid out exactly as shown in the plot plan, and that the plaintiff never attempted to enforce this specific layout. They suggest that the failure to stripe the northern boundary indicated that it was not intended to be part of the parking easement. Besides arguing that the parking easement was not intended to include the northern boundary and that it was too indefinite to be enforced, the defendants contend that the plaintiff's easement for ingress and egress over the roadway was not exclusive and could accomodate the 74-foot easement.

As the plaintiff notes, however, there was ample testimony presented to establish that the parties intended exhibit A to define the area to which the parking easement attached, that the perpendicular hash marks included on exhibit A along the entire northern boundary of the shopping center indeed represented parking stalls, and that the plaintiff's failure to insist that those parking spaces actually be painted did not indicate that the parties had not intended to include that area in the parking easement or that the plaintiff was relinquishing its parking rights there.

No particular words are necessary to constitute a grant of an easement, and any words clearly showing such intention are sufficient

to confer an easement that is grantable by law. (*Coomer v. Chicago & North Western Transportation Co.* (1980), 91 Ill. App. 3d 17, 23.) The instrument creating the easement is considered in accordance with the intention of the parties. (91 Ill. App. 3d 17, 23.) Here, it was not against the manifest weight of the evidence for the trial court to conclude that the parking easement intended by the parties included the area shown by the perpendicular hash marks located on the northern boundary, including the northeast corner. Nor is there any indication that the plaintiff relinquished its easement rights under the lease. Mere nonuse will not constitute an abandonment of an easement created by grant, unless there are circumstances showing an intention of the dominant owner to relinquish his right or there is adverse possession. *Kurz v. Blume* (1950), 407 Ill. 383, 387; *Beloit Foundry Co. v. Ryan* (1963), 28 Ill. 2d 379, 390.

■ The second issue is whether the trial court's finding that Mulford Village and McDonald's had notice of the plaintiff's purported easement was contrary to the manifest weight of the evidence. In support of this argument, these defendants point out that the plaintiff's lease was never recorded, that they had no way of knowing that "Logli" was the plaintiff's business name, that there were no parking stripes painted in the northeast corner that would suggest parking rights, that they relied on title commitments issued by Chicago Title Insurance Company as evidence of marketable title, and that recorded references to the lease referred to a storeroom and gave no indication of any parking rights. In essence, the defendants are contending they were innocent purchasers for value.

Purchasers of real estate have a duty to examine the record and are chargeable with notice of whatever appears in the record chain of title. One having notice of facts that would put a prudent person on inquiry is chargeable with knowledge of other facts that might have been discovered by diligent inquiry. (*Smith v. Grubb* (1949), 402 Ill. 451, 464-65.) Where real estate is in the possession of someone other than the record owner, such possession is generally regarded as notice of the interest represented thereby and is legally equivalent to the recording of such interest; a purchaser is bound to inquire of the person in possession by what tenure he holds and what interest he claims in the premises. Because possession has such substantial significance and consequences, it must be visible, open, exclusive, and unambiguous. (*Burnex Oil Co. v. Floyd* (1969), 106 Ill. App. 2d 16, 21-22.) Purchasers of land burdened with an easement take the land subject to easements expressly created of which they have notice and such other easements as are apparent from an inspection of the premises. *Casey-*

*ville Township Road District v. Union-Electric Co.* (1971), 1 Ill. App. 3d 715, 719.

■ In the present case, there was sufficient evidence to sustain a finding that the defendants had constructive notice of the plaintiff's interest. Although the lease itself was not recorded, and the record therefore did not reflect the actual parking easement, the lease was referred to in recorded documents. Moreover, the defendants received a title commitment from Chicago Title Insurance Company pointing out an exception for this lease. The fact that the reference was to a lease with Pacemaker, rather than Logli, and that it referred specifically to Storeroom No. 1, which the defendants argue precluded their notice of any interest in the parking lot, did not excuse the defendants from a duty to diligently inquire about the terms of the lease. The mere fact that the name on the plaintiff's grocery store was Logli, rather than Pacemaker, is not dispositive, since the defendants did not investigate the interest as it was their duty to do, simply based on the location of the interest as attached to the real estate involved in their transaction.

■ The third issue is whether there was a proper basis for the equitable relief granted by the trial court. The defendants argue that the plaintiff's parking easement was nonexclusive, that any interference with it was inconsequential, that the plaintiff was not irrevocably harmed, that the plaintiff's allegation of interference with the parking easement was a subterfuge to prevent sharing its easement for ingress and egress through the entranceway, and that the effect of the mandatory injunction on various defendants would be catastrophic. In response, the plaintiff cites four cases that it contends support the right of a tenant to have a conflicting use enjoined, where a plot is incorporated into a lease diagramming the extent and nature of a tenant's easement and the landlord grants to a third party the right to use a specific section of the diagram in a way inconsistent with the easement.

In *Mutual of Omaha Life Insurance Co. v. Executive Plaza, Inc.* (1981), 99 Ill. App. 3d 190, the plaintiffs leased a portion of an office building, which included the use of a common parking lot by the tenants of the building and their clients. Subsequently, the landlord entered into a lease with a new tenant, giving it exclusive access to 32 of the 148 parking places, with access to the 32 spaces controlled by a gate. The court held that the use of the appurtenant parking area could not be reduced or substantially altered during the term of the lease, reasoning that the promised use probably formed a part of the bargain of the lease. The court noted that a mandatory injunction was

proper even if only minor interference was shown and that a showing of irreparable injury did not require that the injury be beyond the possibility of compensation or that it be very great. The fact that no actual damages could be proved and that only nominal damages could be awarded was considered a good reason for equitable relief. 99 Ill. App. 3d 190, 194-95.

In *Great Atlantic & Pacific Tea Co. v. La Salle National Bank* (1979), 77 Ill. App. 3d 478, the court upheld a complaint to enjoin construction of a drive-in bank facility in the parking lot of a shopping center· in which the plaintiff maintained a store. The plaintiff's lease included the free use of striped parking as shown in an attached plot plan. The court noted that that could be the basis of an easement appurtenant. 77 Ill. App. 3d 478, 483.

In *Walgreen Co. v. American National Bank & Trust Co.* (1972), 4 Ill. App. 3d 549, the court upheld an injunction prohibiting the defendant's construction of a kiosk for a photography business in a shopping center parking area. The plaintiffs had a lease that included parking areas as shown on an attached plan. The proposed kiosk was to be placed in a part of the shopping enter that was designated in the plan as a parking area. The lease also provided that the parking area would contain at least 150,000 square feet and provided parking for at least 400 automobiles. The plan depicted markings for 463 parking spaces. The court noted that the erection of this kiosk would violate the right to parking as set forth in the parking plan and would eliminate three spaces that had been used for parking for over 10 years. Moreover, it would be separate from the mall and would not draw customers to the mall area. In those circumstances, an injunction was deemed appropriate relief. 4 Ill. App. 3d 549, 556.

In *Fair v. Evergreen Park Shopping Plaza of Delaware, Inc.* (1955), 4 Ill. App. 2d 454, the court upheld a mandatory injunction ordering the defendants to remove part of an existing storefront that extended five feet beyond the original building line into a shopping center parking lot. The plaintiff was the original tenant of the shopping center. Its lease provided for parking to be used in common with all other tenants, to be located in accordance with a site plan later incorporated into the lease. The court noted that the defendant had actual notice of the plaintiff's rights when it erected the encroachment and concluded that there were no equities in favor of the defendant and no occasion for balancing the equities. 4 Ill. App. 2d 454, 470.

These cases indicate a willingness to protect the property right itself by injunction. In the present case, it has been established that the plaintiff had a protectible interest in its parking rights. The defend-

ants neglected to make diligent inquiries that could have led to the discovery of the plaintiff's interests. The defendants are not land-locked, since they do have access to Mulford Road from the north. The parking rights that the plaintiff seeks to protect are an integral part of its lease, for which it pays a substantial annual rent. The findings of the trial court were not against the manifest weight of the evidence and furnish a sound basis for the injunctive relief granted.

■ The fourth issue is whether the trial court erred in refusing to require testimony from the president of the plaintiff corporation, who had negotiated the lease upon which the equitable relief was based. The defendants urge that, since the lease was determined by the trial court to be ambiguous, they are prejudiced by the trial court's refusal to require testimony from the plaintiff's president, citing Supreme Court Rule 237(b) (87 Ill. 2d R. 237(b)). However, as the plaintiff points out, the court relied in its decision upon a medical opinion that the president's appearance for a deposition could be life-threatening. Moreover, there was testimony presented at the trial by one of the parties who was present during the negotiations for the lease. Compelling the appearance of a party litigant at trial under Rule 237(b) is a matter for the sound discretion of the trial court, rather than a mandatory requirement. (*O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 947.) A court's power to order a party to appear should only be exercised for a good cause and in such a manner that a party may not be subjected to harassment, oppression, or hardship. (*Oakview New Lenox School District No. 122 v. Ford Motor Co.* (1978), 61 Ill. App. 3d 194, 198-99.) In the circumstances of this present case, there was no abuse of discretion.

■ The fifth issue is whether the trial court erred in denying a motion to dismiss Montgomery Ward & Company as a party defendant. The defendants argue that Montgomery Ward & Company was simply a co-tenant of the plaintiff and that no cause of action was pleaded or proved against it to make it subject to an adverse judgment, noting that Montgomery Ward was neither the fee holder of the shopping center, the landlord, nor the conveyor of the 74-foot easement. The trial court refused Montgomery Ward & Company's motion at the close of the plaintiff's evidence to be directed out as a party defendant, reasoning that a declaration of rights would involve it.

Section 2—405 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—405) permits the joinder of defendants who are alleged to have or claim an interest in the controversy or any part of it or whom it is necessary to make a party for the complete determination or settlement of any question involved in the controversy.

The plaintiff sought a declaration of rights as well as an injunction. Since Montgomery Ward & Company had parking rights under the lease also, the ruling of the trial court was correct.

Finally, the defendants make numerous references in their briefs to the trial judge's comments that this was a case where there was a remedy by way of money damages and that the plaintiff was using the parking issue simply to prevent access to the northeastern entrance and not for the stated purpose of protecting the parking easement. The context of the comments is that they were made immediately following the court's findings and rulings and were not a part of its disposition of the case. The trial judge made it very clear that his subsequent remarks were "extrajudicial," had no effect on his ruling, were "not judicial pronouncements," and were "off the record." He was simply suggesting that the parties seriously contemplate a settlement before pursuing an appeal. The defendants suggest that the comments were part of the court's findings, but they clearly were not and we do not so regard them.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

HOPF and VAN DEUSEN, JJ., concur.