RNR REALTY, INC., Plaintiff-Appellee, v. BURLINGTON COAT FACTORY WAREHOUSE OF CICERO, INC., *et al.*, Defendants-Appellants.

First District (3rd Division)   Nos. 87—1629, 87—1929 cons.

Opinion filed March 16, 1988.

211

Jenner & Block, of Chicago, for appellants.

Alan O. Amos & Associates, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff RNR Realty, Inc., the landlord, filed suit against its tenant, defendant Burlington Coat Factory Warehouse of Cicero, Inc. (Burlington), and its parent company, Burlington Coat Factory Warehouse Corporation, alleging breach of a lease for commercial property. Following a bench trial, the trial court entered judgment in favor of plaintiff, and against defendants on both the complaint and on defendants' countercomplaint.

Defendants appeal, contending that the trial court erred as a matter of law in holding that plaintiff fulfilled its lease obligations; that the trial court erred as a matter of law in holding that Burlington breached the lease when it stopped paying the full rent and later abandoned the property without having suffered a constructive eviction; that the trial court erred as a matter of law in finding the parent company liable under the lease guaranty; and that the trial court abused its discretion in denying defendants' motion for a continuance.

In July 1984, the parties negotiated to lease plaintiff's commercial property located at 8101 South Cicero Avenue in Chicago. The property covers approximately 93,000 square feet. Burlington rented 90% of the premises, and an appliance store rented the remaining 10%. The lease stated that plaintiff was to provide Burlington with three areas of parking. First, 127 spaces were available in the lot adjacent to the Burlington store. Second, 102 spaces were initially available in the Century Supply Company lot just south of the leased premises. Third, 100 spaces were initially available in the Scottsdale Shopping Center lot located just north of the leased premises and separated from the property by 81st Street.

In the summer of 1984, plaintiff believed the Century Supply lot was accessible under a cross-easement agreement. On October 31, 1984, two week after Burlington opened, Century Supply erected concrete barriers which prevented vehicular access between its lot and the Burlington lot. Plaintiff, with Burlington's cooperation, sued Century Supply. Plaintiff's request for injunctive relief was denied by the court in that action. Sheldon Harris, a vice-president for plaintiff, testified that when plaintiff lost the suit to Century Supply the parties here began discussing the construction of a parking garage. Ronald L. Boorstein, an attorney for plaintiff, testified that in September or October of 1985 he and Harris observed that the barricades had been pushed aside. Dave Miletic, Burlington's store manager, testified that to his knowledge the barriers had never been moved.

In August 1984, plaintiff obtained an oral option to use 100 spaces in the Scottsdale lot for the 20-year lease term. A written lease agree-

ment with Scottsdale was drafted but not executed by plaintiff. The rent was to be approximately $18,000 per year for 15 years. After several months, the Scottsdale managers denied Burlington the use of the Scottsdale lot and had Burlington remove the signs directing its customers to that lot. David Katz, an owner of the Scottsdale shopping center, testified for Burlington that permission to use the 100 parking spaces was withdrawn when plaintiff failed to pursue the matter.

Harris and Boorstein testified for plaintiff that Burlington repeatedly indicated that it was not interested in using any parking space in the Scottsdale lot for its customers or employees. Burlington's witnesses denied making such statements.

In addition, plaintiff alleged that Burlington failed to maintain the roof and ceiling of the building. Burlington negotiated the lease and the parent company agreed to certain guaranties of the subsidiary's rent, and the subsidiary agreed to maintain the premises, including the roof.

Robert Lee, a roofing contractor, testified for plaintiff that in July he inspected the roof and found water damage inside. Plastic had been put on the ceiling to keep the water from getting on the merchandise. In September 1986 he inspected the outside of the roof. Lee found severe deterioration. He recommended a complete new roof at an estimated cost of $149,348.

In April 1985, due to inadequate parking, Burlington began partially abating its rent payments by $5,000 per month. In November 1985, Burlington increased the abatement to $10,000 per month. On March 26, 1986, Burlington informed plaintiff that as lessor it was in default because of the inadequate parking. On July 31, 1986, Burlington moved to 8320 South Cicero Avenue. This smaller store was purchased by the parent company.

Roy Evans testified for Burlington as an architect and engineer. He stated that a building the size of the Cicero Avenue store, 94,000 square feet, was required under the Chicago zoning ordinance to have 225 parking spaces. His clients generally require $4\frac{1}{2}$ to 5 parking spaces per thousand feet. Moreover, it is best to have the parking visible from the street. Here, parking was inadequate even when the lease was originally signed. Belmonte, Burlington's regional manager, also testified that the parking was inadequate at all times. Miletic testified that the parking was adequate when all three lots were available.

Robert Grapski, general regional manager for Burlington, testified as to the sales and square footage for the six Chicagoland stores

from 1980 through 1986. Grapski calculated Burlington's losses on the basis of the sales per square foot. At the five other Chicago area stores, the average sales were $141.68 per square foot. At the 8101 south Cicero store, sales were $90.93 per square foot. Grapski concluded that Burlington lost $345,000 in revenues in 1985 and $287,000 in the first nine months of 1986 partly as a direct result of the parking problems.

From April 1985 through December 1986, Burlington withheld $287,198.87 in rent payments. In addition, Burlington did not pay its 90% share of the actual out-of-pocket expenses, $52,225.94, that plaintiff incurred during the occupancy, and withheld its share of real estate taxes.

Plaintiff filed suit against defendants, seeking an injunction requiring Burlington to perform its obligations under the lease; an injunction preventing Burlington from occupying its new premises; a declaratory judgment that the lease is in full force and effect and requiring Burlington to continue to pay rent until the property was released; damages for all past-due rent; damages for all tenant expenses under the lease, including the cost of a new roof; plaintiff's costs and attorney fees; and the parent company's liability under the guaranty.

Defendants filed a counterclaim seeking damages, alleging that plaintiff had constructively evicted Burlington and breached the lease.

The trial court held that defendants were liable for rent only through April 1987, which permitted a time reasonable for plaintiff to relet the premises. Plaintiff was awarded $333,862.54 for rent and other expenses which the tenant was required to pay under the lease. The court denied plaintiff's claim that defendants should pay $149,348 for roof repairs, and denied its claim that defendants were obligated for the remainder of the 20-year lease term. The trial court held further that plaintiff did not refinance the property so as to trigger the five-year guaranty provision. The parent corporation, however, was liable for six months' rent under an additional provision in the amended guaranty. Defendants' post-trial motion was denied, and the trial court awarded plaintiff attorney fees and costs pursuant to the terms of the lease.

Defendants contend on appeal that the trial court erred as a matter of law when it found that Burlington, and not plaintiff, breached the lease. Defendants point to paragraph 1.02 of the lease, which provides that "the use and occupation by the tenant of the leased premises include the *** customer car parking areas" as shown on exhibits to the lease, and other facilities which the lessor might designate. The relevant exhibits to the lease depicted the 8101 South Cicero lot, the

Century Supply lot, and the Scottsdale lot. The lease provided further:

"9.02 Parking.

All common areas and facilities, including the parking lot, upon the Real Estate which Tenant may be permitted to use and occupy, shall be used and occupied as part of this Leasehold. If the amount of such areas be diminished, Lessor shall be subject to liability or Tenant shall be entitled to compensation or diminution or abatement of rent.

Should the parking to the rear of the Scottsdale Shopping Center as shown on Exhibit "C" be reduced below 100 parking spaces, Landlord covenants and agrees that within six (6) months after notice to Landlord of the proposed reduction, Landlord will replace said reduced parking with comparable parking facilities no further from the Demised Premises than the lost parking area."

Thus, defendants initially base their contention that plaintiff failed to fulfill its obligations under the lease on the ground that plaintiff did not obtain a written option for the Scottsdale parking space. The testimony conflicted as to whether or not Burlington refused to accept, and thus waived entitlement to, the Scottsdale parking which plaintiff offered according to the terms of the lease.

■ Where the trial court merely interprets a lease, the reviewing court's interpretation is a question of law and may be made independently of the trial court's judgment. (*Hartwig Transit, Inc. v. Menolascino* (1983), 113 Ill. App. 3d 165, 446 N.E.2d 1193.) That principle applies, however, only where the material questions of fact are not in dispute. (See *In re Estate of Offerman* (1987), 153 Ill. App. 3d 299, 505 N.E.2d 413; *Trapkus v. Edstrom's, Inc.* (1986), 140 Ill. App. 3d 720, 489 N.E.2d 340; *Schwarze v. Solo Cup Co.* (1983), 112 Ill. App. 3d 632, 445 N.E.2d 872.) Conflicting testimony on factual issues is for the trier of fact to resolve. The trial court observes the manner and demeanor of the witnesses, and the credibility of those witnesses is a matter for the trial court to determine. This court will not disturb its findings, even in the face of contradictory evidence, unless those findings are against the manifest weight of the evidence. *Orchard Shopping Center, Inc. v. Campo* (1985), 138 Ill. App. 3d 656, 485 N.E.2d 1248.

■ In the present case, the record reveals serious conflicts between the testimony of the witnesses in regard to Burlington's use of the Scottsdale parking lot.

Plaintiff initially made every effort to secure the additional park-

ing in the Scottsdale lot. Levine, plaintiff's broker, and Katz, Scottsdale's owner, both testified that plaintiff obtained a verbal option to lease the parking lot behind the shopping center. Harris, plaintiff's vice-president, testified that plaintiff obtained a verbal commitment from Scottsdale for 100 spaces; established a yearly fee for 15 years; permitted the posting of signs directing Burlington's customers to the Scottsdale lot; and arranged for Burlington's use of the lot for several months without rent while the written option was being negotiated and executed.

Defendants point, however, to the fact that after several months, plaintiff did not pursue the matter and thus Scottsdale withdrew its permission and had Burlington remove posted signs indicating its customers could park in the lot.

Harris countered that plaintiff did not obtain the written lease from Scottsdale because Burlington's representatives "indicated they didn't think it was necessary for us to proceed with it. They weren't satisfied with its use." Riley, Belmonte and Miletic told Harris that "[c]ustomers weren't using it. The signs they put up weren't doing the job for customers to use it. The employees that were using it were getting some vandalism on their cars. They had to hire a guard, and they felt it was marginal usage, and the customers weren't using the front of the Scottsdale parking anyway."

Similarly, Boorstein, plaintiff's attorney who negotiated the lease, testified that several Burlington employees notified plaintiff that the Scottsdale lot was not being used by Burlington. Boorstein testified further that Kassner, defendants' attorney, told him in late 1985 that the Scottsdale parking was not helpful to Burlington. At one point, Boorstein advised Kassner that plaintiff could obtain additional parking from Goldblatts in the Scottsdale shopping center. Kassner rejected suggestions of using any parking from the Scottsdale center.

In addition, plaintiff presented evidence indicating that Burlington made a decision to vacate the premises due to its burdensome financial obligations under the lease, and not due to parking problems. Harris understood from Kassner that Burlington wanted to leave because the lease and the roof maintenance and repairs were too expensive. This statement was supported by Lee's testimony that the roof needed extensive work. Under the lease, Burlington was required to maintain the roof. When plaintiff asked Burlington to help finance a parking garage to alleviate any parking problems, Kassner told Boorstein Burlington was not interested. "[S]o I asked [Kassner] one last time if there was something we could do, and the answer was, 'No, we're leaving the premises regardless of what you do.' "

Defendants' witnesses testified to the contrary. Kassner denied telling Boorstein that Burlington had no need for the Scottsdale parking, or that the building maintenance was too expensive. Belmonte denied stating that Burlington did not want to use the Scottsdale lot. This statement was undermined, however, by his own testimony that he did not know whether the lot was useful. Belmonte also testified that he was at the store at least once a week but that he was never present when the Scottsdale lot was used. On cross-examination Belmonte specified that neither customers nor employees used the parking.

Miletic denied telling Harris the Scottsdale lot was not useful to Burlington. He also denied receiving any complaints from employees about vandalism in that lot. His testimony was weakened by his admission that he hired security guards for that lot. Plaintiff's contention that Burlington found the Scottsdale lot not useful was supported by Miletic's testimony that the customers faced difficulties in reaching the lot. In 1985, Chicago changed 81st Street into a one-way street going west, and cars could no longer turn into the relevant portion of the Scottsdale lot off Cicero Avenue, the main thoroughfare.

Defendants argue that any statements made by their employees or attorneys concerning the Scottsdale lot were made after Burlington's right to use the lot had been terminated by the Scottsdale owners as of February 1, 1985. Defendants improperly limit the applicability and weight of these statements when they insist that the 1985 and 1986 statements are not meant to support plaintiff's "contention that it was directed not to secure use of the Scottsdale lot in 1984." The statements, whenever they were made, clearly refer to the time that the Scottsdale lot was open to Burlington. In response to plaintiff's repeated attempts, throughout 1985 and 1986, to offer the original Scottsdale space or a different area near Goldblatts, Burlington's employees and attorneys rejected any Scottsdale parking as being not helpful, not easily accessible, not wanted. It would be absurd to assume that, e.g., Kassner's April 1986 statement that the Scottsdale parking was "meaningless" applied to anything but the time period in which Burlington had been permitted to use that space. It is unlikely that defendants' counsel was unaware of the fact that Scottsdale no longer permitted his client to use that space.

As to the waiver of any rights to the Century Supply lot, defendants argue that when plaintiff failed to provide parking in that lot, "it breached its lease regardless of any alleged waiver with respect to the Scottsdale lot." Again, the testimony was conflicting. For example, Boorstein testified that in fall 1985 he met with Harris at the store's

parking lot and they found that Century Supply had pushed the barricade aside and that Burlington's customers were parking there.

As we have stated, the credibility of these witnesses is a matter for the trial court to resolve. In view of the conflicting testimony found throughout the record, we cannot say the trial court was presented with a question of law. Moreover, its findings that Burlington waived any claim of entitlement to the use of the Scottsdale parking is not against the manifest weight of the evidence. In regard to the Century Supply lot, Burlington's refusal to accept any parking in the Scottsdale lot, including the Goldblatts area, as an alternative operates as a waiver to any entitlement to alternative parking space.

■ Furthermore, notwithstanding the issue of whether plaintiff's failure to obtain a written option on the Scottsdale parking area was excusable, Burlington failed to prove any legally justifiable ground for abandonment of the leased premises. Defendants argue, however, that the trial court erred in finding that Burlington failed to meet its burden of proof in establishing that it was constructively evicted by plaintiff.

A tenant must rest its right to abandonment upon some justifiable ground. (See generally 24 Ill. L. & Prac., *Landlord & Tenant* §344 (1980).) Defendants here argue that plaintiff constructively evicted Burlington when it failed to provide adequate parking. Constructive eviction was not proved here for several reasons.

Constructive eviction cannot exist where the tenant does not surrender the property. (*Advertising Checking Bureau, Inc. v. Canal-Randolph Associates* (1981), 101 Ill. App. 3d 140, 427 N.E.2d 1039.) In the present case, the Century Supply parking became unavailable on November 1, 1984, and the Scottsdale parking became unavailable on February 1, 1985. Burlington delayed notifying plaintiff it was in default until March 26, 1986. Burlington then postponed vacating the premises for an additional four months.

Burlington therefore delayed its abandonment of the premises for 18 months after it lost both lots. Whether or not a reasonable time in which to vacate has passed is a question of fact. (*Automobile Supply Co. v. Scene-in-Action Corp.* (1930), 340 Ill. 196, 172 N.E. 35.) The trial court could properly find that Burlington intentionally and unreasonably retarded its abandonment of the premises until it found a smaller building which its parent company could buy. Thus, the court could conclude that no constructive eviction occurred.

■ Furthermore, Burlington failed to show that plaintiff's acts in not obtaining the Scottsdale parking were of a grave and permanent character done with the intention of depriving defendant of the full

enjoyment of the premises. (*Advertising Checking Bureau, Inc. v. Canal-Randolph Associates* (1981), 101 Ill. App. 3d 140, 427 N.E.2d 1039.) Acts or omissions of the landlord which make it necessary for the tenant to move constitute a constructive eviction. (*John Munic Meat Co. v. H. Gartenberg & Co.* (1977), 51 Ill. App. 3d 413, 366 N.E.2d 617.) For example, a constructive eviction may result from a landlord's failure to keep the demised premises in a tenantable condition.

Untenantability exists when the destruction is of such a nature that the property cannot be used for the purposes for which it was rented and cannot be restored to a fit condition by ordering repairs made without unreasonable interruption of the lessee's use. (*Presbyterian Distribution Service v. Chicago National Bank* (1960), 28 Ill. App. 2d 147, 171 N.E.2d 86.) Whether or not a property is untenantable is a question of fact. (*Puskoris v. Gulik* (1954), 4 Ill. App. 2d 83, 123 N.E.2d 340.) The question of whether a landlord's acts constitute a constructive eviction discharging any liability for rent is a question of fact which depends upon the circumstances of the case. (*Yarger v. Schabacker* (1957), 15 Ill. App. 2d 459, 146 N.E.2d 399.) The trier of fact's decision on whether a tenant has been constructively evicted will not be reversed unless it is against the manifest weight of the evidence. *Applegate v. Inland Real Estate Corp.* (1982), 109 Ill. App. 3d 986, 441 N.E.2d 379.

Defendants rely upon §16.02 of the lease as support for their argument that the loss of the parking spaces rendered the property untenantable:

> "16.02. Untenantability. In the event of damage to or destruction of the leased premises or the common areas or any portion thereof, from any cause whatsoever which in the reasonable opinion of Tenant shall render the leased premises or common areas substantially untenantable for the purpose for which they shall then be occupied ***.''

At trial, Burlington attempted to prove the premises were no longer suited for the purposes for which they were leased by showing that the loss of parking directly resulted in a loss of business and less revenue. Burlington relies upon Grapski's testimony showing that its sales revenue per square foot of selling space differed considerably from the higher average sales revenue per square foot of selling space at the other five Chicagoland Burlington stores.

The trier of fact was entitled to conclude that Grapski's testimony failed to prove untenantability for several reasons.

Burlington offered no evidence that the store operated at a loss,

or even showed how the operating expenses compared to its revenue. For various reasons, including its obligation to maintain a seriously deteriorated roof, the operating expenses for this store may have grossly diminished its revenue.

Moreover, Grapski admitted that only 20% to 25% of the 46% loss from December 1984 to January 1985 was due to parking problems. He agreed that other factors could cause a loss. For example, the store's management, the store's appearance, or a high square-footage figure could also adversely affect the sales per-square-foot analysis. The Cicero Avenue store had the largest gross square-footage area, by 22,000 square feet, of any of the six Chicagoland stores.

Significantly, Grapski's reliance upon a 46% decline in sales from December 1984 to January 1985 in the Cicero Avenue store carries little weight when the figures show similar or greater declines in the other stores. The Libertyville store declined 52%; the Chicago store went down 40%; the Arlington Heights store sales dropped 44%; the Villa Park store decreased 40%; and the Merrillville store lost 53%. Thus, the 46% sales decrease for the Cicero Avenue store matches the average for all the stores.

Furthermore, the sales for August, September and October 1985 in the 8101 South Cicero store, and the sales for those months in 1986 in the 8320 South Cicero store, were nearly identical. The evidence also shows that after the Century Supply parking was lost, the sales at the Cicero Avenue store increased. Between November and December 1984 the sales at the Cicero Avenue store increased, while four of the five other stores showed declining sales in that period.

Other pertinent factors bearing upon the question untenantability include the fact that the cost of the Scottsdale rental, $18,000 per year, was a modest sum compared with the $287,198.87 in rent which defendant withheld from April 1985 through December 1986. (See *Presbyterian Distribution Service v. Chicago National Bank* (1960), 28 Ill. App. 2d 147, 171 N.E.2d 86.) In addition, the court could consider the fact that the 20-year lease still had 18 years to run when defendant abandoned the premises. See *Presbyterian Distribution Service v. Chicago National Bank* (1960), 28 Ill. App. 2d 147, 171 N.E.2d 86.

In summary, the trier of fact had sufficient evidence from which it could conclude that Burlington was in breach of the lease by reason of its abandonment and failure to pay rent. Defendants failed to prove the loss of parking caused any loss in profits. The trial court could reasonably infer from the evidence that there was insufficient proof of causation between the decreased parking and any decline in Burling-

ton's revenue. We hold that the trial court did not err in concluding that Burlington failed to meet its burden of proof in establishing that it was constructively evicted from the leased premises.

The cases cited by defendants (see, *e.g., Madigan Brothers, Inc. v. Melrose Shopping Center Co.* (1984), 123 Ill. App. 3d 851, 463 N.E.2d 824; *Pacemaker Food Stores, Inc. v. Seventh Mont Corp.* (1983), 117 Ill. App. 3d 636, 453 N.E.2d 806; *Walgreen Co. v. American National Bank & Trust Co.* (1972), 4 Ill. App. 3d 549, 281 N.E.2d 462) are distinguishable on the basis that they involve requests for injunctions to prevent a landlord from interfering with a tenant's parking space. None of the cases involve a lessee's unilateral declaration that the lease had terminated, with the lessee's abandonment of the premises and refusal to pay rent.

Defendants also rely upon *American National Bank & Trust Co. v. Sound City, U.S.A., Inc.* (1979), 67 Ill. App. 3d 599, 385 N.E.2d 144, where the trial court entered a judgment against the plaintiff landlord who sought nine months' rent remaining on a one-year lease and held for the defendant tenant on the ground of constructive eviction. This judgment was upheld on the basis that constructive eviction is a factual question and there the evidence supported a finding that the landlord breached his covenant to repair and thus the premises became unfit for the tenant's business.

Defendants here mischaracterize the problem in *Sound City* as merely "aesthetic appearance." In that case, the shopping center space which defendant rented, after the landlord promised to make certain repairs, had serious physical problems within the store itself. The premises had ceiling tiles either missing or simply loosely hanging; water marks on the ceiling; even after it was painted seven or eight times; bare fluorescent light fixtures; and a missing partition. Moreover, the property's problems in that case were easily fixable and the tenant did not refuse alternatives which were provided under the lease. Nothing in *Sound City* alters our finding that in the present case the trial court was presented with sufficient evidence to support a finding that Burlington was not constructively evicted.

■ Defendants also contend that the trial court erred as a matter of law in finding the parent company liable under the lease guaranty. The guaranty provided that the parent company guarantees to plaintiff "from the date of landlord's refinancing of the real property leased to tenant and for a period of five years thereafter" payment of the rent and performance of Burlington's obligations under the lease. An amendment added in a letter dated August 20, 1984, provided that Burlington's parent company guaranteed the payment of

rent for six months if Burlington discontinued its use of the premises or abandoned them. At trial, the court found plaintiff had not proved that a refinancing of the property occurred, and thus the five-year guaranty was not effective, but the six-month guaranty applied here. Defendants argue that the added six-month provision was not an independent guaranty and thus the condition precedent of refinancing also applied to that provision.

The added provision states:

> "In addition to the foregoing, the Guarantor has agreed to amend the Lease Guaranty to add the following paragraph after the second paragraph thereof:
>
> In addition to the foregoing, Guarantor hereby guarantees to Landlord the payment of all rent due under the Rental Agreement for a period of six (6) months if, at any time during the entire term of the Rental Agreement, Tenant shall discontinue its use, in accordance with the Rental Agreement, of the premises leased thereunder or shall otherwise abandon such premises."

When determining the intention of parties to a lease, words should be given their common and generally accepted meaning. (*Kurek v. State Oil Co.* (1981), 98 Ill. App. 3d 6, 424 N.E.2d 56.) The added provision here clearly indicates the guaranty is "in addition to" the previously stated guaranty. Moreover, the added provision applies "at any time during the entire term of the Rental Agreement." We find no language indicating the condition precedent of refinancing is applicable to this provision. The trial court properly concluded that the provision applies here and that the parent company is liable for six months' rent.

■ Defendants next contend that the trial court abused its discretion in denying their motion for a continuance. The court's denial of a motion for a continuance will not be disturbed unless there has been a manifest abuse of discretion or palpable injustice appears in the record. (*Bender v. Consolidated Mink Ranch, Inc.* (1982), 110 Ill. App. 3d 207, 441 N.E.2d 1315.) On September 12, 1986, the court set the cause for trial on November 18 through 21, without objection. Plaintiff initiated discovery on September 18. As of November 12, defendant had not answered the discovery requests. On November 12, defendants moved for a continuance on the basis that their attorney's office had been flooded in September or October. Their lead counsel was in New York, however, with unflooded offices. Records located on the East coast could have been brought to Chicago earlier, particularly since plaintiff sought them in discovery. Moreover, no additional

motion for continuance was made at trial. We find no abuse of discretion.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

WHITE, P.J., and RIZZI, J., concur.